[No. 892.    March 3, 1904.]

TERRITORY OF NEW MEXICO, Plaintiff and Appellant, v. THE PERSONS, REAL ESTATE' LAND and PROPERTY Described in the Delinquent Tax List of the County of Bernalillo for the First Half of the year, 1899, Defendants and Appellees.

### SYLLABUS.

The lands of the Pueblo Indians in New Mexico are taxable.

Appeal from the district court of Bernalillo county, before J. W. CRUMPACKER, Associate Justice. Reversed and remanded.

T. A. FINICAL, District Attorney, E. L. BARTLETT, Solicitor General, and G. W. JOHNSTON, of counsel, for appellant.

Are the lands of the Pueblo Indians in New Mexico taxable?

> United States v. Jose L. Luciro, 1 N. M. 422; United States v. Juan Santisteven, 1 N. M. 583; United States v. Archibald Ritchie, 17 How. (U. S.) 525; secs. 1893 and 1895, Comp. Laws N. M. 1897; United States v. Joseph, 1 N. M. 593; s. c., 94 U. S. 614.

WILLIAM H. POPE, Special Attorney for the Pueblo Indians of New Mexico, for appellees.

The enjoyment of political privileges is a concomitant of the imposition of the burden of taxation.

> State v. Ross 7 Yerg. (Tenn) 74; Me-Shing-go-me-Sia v. State, 36 Ind. 310-317.

Do our laws allow these Indians to participate equally with us in our civil and political privileges?

"The Pueblo Indians of this Territory for the present, and until they shall be declared by the Congress of the United States to have the right are excluded from the privilege of voting at the popular elections of the Territory, except in the election of overseers of ditches to which they belong, and in the elections proper to their own Pueblos to elect their officers according to their ancient customs."

> Compiled Laws of 1897, sec. 1678.

The answer alleges that these Indians are wards of the government, and the demurrer admits it. What are wards of the government?

> United States v. Kagama, 118 U. S. 375-385; U. S. v. Boyd, 68 Fed. Rep. 577, 83 Fed. Rep. 547; Audelor General v. Williams, 94 Mich. 180; Elk v. Wilkins, 112 U. S. 94, 106; Felix v. Patrick, 145 U. S. 330.

Under the law of Spain and ·Mexico the power to alienate land was withheld from the Pueblo Indians upon principles of public policy.

> Sunol v. Hepburn, 1 Col. 255; Hicks v. Coleman, 25 Col. 122; Wau-pe-mau-qua v. Aldrich, 28 Fed. 489, 499.

Under the Spanish decree of March 13, 1811 (Halls Mexican Law, p. 169, 1 Dublau y Lozano, p. 340) the Indians were given exemption from taxation, and under article 8 of the treaty of Guadalupe Hidalgo, they were guaranteed that their property rights should be inviolably respected.

PARKER, J.—On the fourth of June, 1900, a suit for the collection of taxes which were delinquent for the first half of the year 1899 was begun under the provisions of law, and was a blanket suit covering all cases for delinquent taxes.

Among other property on which taxes were delinquent, were the land grants described in the transcript in this cause. These grants are the property of the Pueblo Indians. The attorney for defendants filed answers to the complaint for each of the Indian Pueblos. Plaintiff filed a general demurrer to the answers, alleging that they did not set forth facts sufficient to constitute a defense. The district court overruled the demurrer and ordered the complaint dismissed as to said Indian defendants. Plaintiff appeals.

The single question presented by this record is as to whether the lands of the Pueblo Indians are taxable.

It would be an inviting task to trace the history of these people since the advent of the Spanish conquerors; but, as this court has, in a very interesting opinion, dealt with this subject, we content ourselves with reference thereto. U. S. v. Lucero, 1 N. Mex. 422.

They were found a peaceful, industrious and civilized people, living in towns (pueblos) and following agricultural and pastorial pursuits. In 1689, and within a

few years subsequent, the Spanish government granted them their lands. So long as they remained under the Spanish rule, certain restrictions were placed upon the alienation of their property. Hall's Mexican Law, sec. 160 and 161. As late as March 13, 1811, they were exempted from taxation. Hall's Mexican Law sec. 169, They seem to have been considered by the Spanish as wards of the government and entitled to special privileges and protection.

But a complete change took place in the status of these people when Mexico threw off the Spanish yoke. Among those engaged in that struggle for independence, this Aztec race far outnumbered the Mexicans and its success was due in a large measure to their efforts. It was but natural and fitting that in the formation of the new government they should take a prominent, if not a leading, part, and that they should be placed upon an equal footing as to all civil and political rights. And so we find that the revolutionary government of Mexico, February 24, 1821, a short time before the subversion of Spanish power, adopted what is known as "The Plan of Iguala" (Iguala was the place of the revolutionary army headquarters), in which it is declared that: "All the inhabitants of New Spain, without distinction, whether Europeans, Africans or Indians, are citizens of this monarchy, with the right to be employed in any post according to their merit and virtues;" and that: "The person and property of every citizen will be respected and protected by the government." I Ordenes y Decretos, by Galvan, page 3; U. S. v. Ritchie, 17 How. (U. S.) 524, 538; U. S. v. Lucero, supra.

The same principles were reaffirmed in the Treaty of Cordova, of August 24, 1821. 1 Ordenes y Decretos, by Galvan, page 6, and in the Declaration of Independence, of October 6, 1821. Id., page 8.

The Mexican congress thereafter followed with at least four acts in each of which "The Plan of Iguala" was

uniformly considered as a fixed principle of Mexican law. U. S. v. Ritchie, supra; 2 Ordenes y Decretos, pages 1 and 92, and 3 Id. page 65.

This latter act was passed August 18, 1824, only twenty-four years before the Treaty of Guadalupe Hidalgo, whereby we acquired this Territory and these people.

How farreaching in its consequences this policy and practice has been may be made more apparent when we recall the fact that Maximilian's defeat by the Mexican troops was accomplished under the leadership of General Juarez, a full-blooded Aztec Indian, and that the man who has so wisely governed Mexico for these last twenty and more years, as President of the Republic, is none other than an illustrious specimen of this Aztec race.

We had then, at the date of the Treaty of Guadalupe Hidalgo, whereby we acquired this Territory, a people possessed of all the powers, privileges and immunities of any other citizens of Mexico, and they came to us so endowed as much as any other class of citizens. This, necessarily, and independent of the provisions of the Treaty of Guadalupe Hidalgo, which so carefully guards the civil rights of all Mexican citizens within the ceded Territory, carried with it the right to take, hold and dispose of their property. Their right of alienation of their property has never been directly passed upon by the Supreme Court of the United States. The Court in United States v. Ritchie, supra, declined to express an opinion on this point, it not being involved. This court, in United States v. Lucero, supra, page 448, stated that the Pueblo of Cochiti had sold a portion of their lands where the town of Pena Blanca stands, and that the sale was recognized as valid by the Mexican government; but we have been unable to verify the court's reference to the decrees of the Mexican republic. But it seems clear that they have such right. No limitation on the power is to be found, either in the

laws of Mexico, the United States, or the Territory. The right of alienation is one of the chief elements of property values, and is possessed by all citizens alike.

A contrary view has been expressed in California. Sunol v. Hepburn, 1 Cal. 255; Hicks v. Coleman, 25 Cal. 122.

But, in view of the conclusion reached by this court in U. S. v. Lucero, supra, U. S. v. Santistevan, 1 N. Mex. 583, and U. S. v. Joseph, Id. 593, and the reasoning there employed, as well as the reasoning in U. S. v. Ritchie, supra, and U. S. v. Joseph, 94 U. S. 614, we have no doubt that the Pueblo Indians in this Territory were citizens of Mexico and at the time of the ratification of the Treaty of Guadalupe Hidalgo, possessed of all the rights of any other citizens, including the right of alienation of their lands.

It follows that unless that status has been changed in some way, by some competent authority, they are subject to taxation.

It is not claimed that any exemption therefrom has been provided by law. The first point made is their alleged lack of power of alienation, which it has been shown is an unwarranted assumption.

The next point urged is the fact that they have been deprived of the elective franchise. In 1854, the Legislature passed the following act:

"The Pueblo Indians of this Territory, for the present, and until they shall be declared by the Congress of the United States to have the right, are excluded from the privilege of voting at the popular elections of the Territory, except in the elections for overseers of ditches to which they belong, and in the elections proper to their own Pueblos, to elect their officers according to their ancient customs," which is section 1678 of the Compiled Laws of 1897.

In the view we take of this point, it is unnecessary to decide whether this act was not abrogated by section

2004 of the Revised Statutes of the United States, for the right to tax has never been limited to such persons as possess the elective franchise. 1 Cooley on Taxation (3 Ed.), 96; Thomas v. Gay, 169 U. S. 264 and 276.

It is urged that these people are wards of the government, and therefore entitled to exemption from the burden of taxation. It is true Congress has, from time to time, legislated concerning these Indians (1 N. Mex. 435 and 436), and there has been appointed, from time to time, agents for them and special attorneys have been furnished them by the government; but never has congress assumed to reduce them to a state of tutelage and their status has never been attempted to be changed by any act of the government. The United States has never assumed to take control of their property; but, on the other hand, it has quitclaimed to them and issued its patent for all their lands. The furnishing of agents and attorneys has been a mere gratuity on the part of the government.

The Supreme Court of the United States in United States v. Joseph, 94 U. S. 618, in passing upon the nature of the title of these Indians, says:

"The Pueblo Indians, on the contrary, hold their lands by right superior to the United States. Their title dates back to grants made by the government of Spain before the Mexican revolution—a title which was fully recognized by the Mexican government, and protected by it in the Treaty of Guadalupe Hidalgo, by which this country and the allegiance of its inhabitants were transferred to the United States."

After mentioning confirmation by Congress (11 Stat. 374), the court further says:

"It is unnecessary to waste words to prove that this was a recognition of the title previously held by these people, and a disclaimer by the government of any right of present or future interference, except such as would

be exercised in the case of a person holding a competent and perfect title in his individual right."

It is further urged that as these lands have not been taxed for fifty years, this amounts to a practical construction of the want of power, under the law, to tax. No defect of the tax laws is pointed out, and they are ample to reach all property, not specially exempted, in the Territory. It is of no force to argue that a taxpayer, who, by reason of the misconception of the law by the taxing officers has escaped taxation for a long period, shall thereby acquire immunity for all time.

It is true, no doubt, that the fact that these people live in communities, separate from the rest of the people, and have local self-government, and thus preserve, in a large measure, the characteristics of their ancient civilization, is the fact which appeals most strongly to the mind and causes it to rebel against the conclusion reached here; but when their history is seen and understood and their legal status examined, they are found to possess all the qualifications and rights of citizenship. They are not unlike, in this respect, the Shakers and other communistic societies in other parts of the country.

It is a matter of history, gathered by the writer from conversations with early residents of the country, that these people were, after the Treaty of Guadalupe Hidalgo and down to the organization of the Territory, and perhaps down to the act of 1854, supra, regarded by the people as citizens, and as possessed of all the rights of the same. They are reported to have participated in elections, and held office in Pena Blanca and other places in the Territory. They sat as grand and petit jurors in this same county of Bernalillo, while Judge H. S. Johnson presided over the same, at one term of court at least. It is reported that through the efforts of one John Ward, an agent appointed for them, there was a tacit agreement reached between them and the people

of the counties where they resided, that as long as they refrained from voting, they should not be taxed. They thus drifted out of the political life of the Territory. But no such agreement, if made, was of any binding force, either upon the Indians or the Territory.

We conclude, therefore, that the Pueblo Indians of New Mexico are citizens of New Mexico and of the United States, hold their lands with full power of alienation, and are, as such, subject to taxation. It follows, from the foregoing, that the district court erred in overruling the demurrer of the plaintiff to the defendants' answers, and the judgment of the district court will be overruled and the cause remanded, with instructions to proceed in accordance with this opinion, and it is so ordered.

Mills, C. J., McFie and Baker, JJ., concur.

Pope, J., having been attorney for the defendants in this court, did not participate in this decision.