## UNITED STATES v. CHAVEZ ET AL.

No. 162. Argued November 6, 7, 1933.—Decided December 11, 1933.

*Solicitor General Biggs,* with whom *Assistant Solicitor General MacLean* and *Messrs. Harry S. Ridgely* and *W. Marvin Smith* were on the brief, for the United States.

*Mr. George R. Craig* submitted the cause and *Mr. David A. Grammer* filed a brief for appellees.

MR. JUSTICE VAN DEVANTER delivered the opinion of the Court.

By indictment in the federal district court for New Mexico, Gregorio Chavez and Jose Maria Chavez, described as " non-Indians," were charged with the larceny, on January 3, 1932, " at and within the limits of the Pueblo of Isleta, the same being Indian Country, in the State and district of New Mexico," of certain live-stock belonging to designated Indians of that Pueblo. By a demurrer the defendants challenged the indictment as not stating an offense against the United States, and in support of the challenge asserted (1) that the Pueblo of Isleta is not Indian country within the meaning of the statutes whereon the indictment is founded, and (2)

that, even if the Pueblo be Indian country, larceny committed therein by one who is not an Indian is not within those statutes. The court sustained the demurrer, dismissed the indictment and gave a certificate declaring in effect that the judgment was put entirely on the ground that when the statutes underlying the indictment are properly construed—and particularly when construed in the light of the act enabling New Mexico to become a State—they do not make larceny within the Pueblo of Isleta by one not an Indian, even of property belonging to an Indian, an offense against the United States, but leave the same to be dealt with exclusively by and under the laws of the State.

The case is here on appeal by the United States under the criminal appeals law.[1]

By §§ 451 and 466, Title 18, U.S.C.,[2] larceny committed in any place "under the exclusive jurisdiction of the United States" is made an offense against the United States, the punishment described varying according to the value of the property stolen; and by § 217, Title 25, U.S.C.,[3] the general laws of the United States relating to the punishment of crimes committed in any place within its exclusive jurisdiction are extended, with exceptions not material here, to "the Indian country." These are the statutes on which the present indictment is founded.

By the enabling act of June 20, 1910,[4] and two subsequent joint resolutions,[5] Congress provided for the admission of New Mexico into the Union as a State "on an

---

[1] Act of March 2, 1907, c. 2564, 34 Stat. 1246; U.S.C., § 682, Title 18, and § 345, Title 28; Acts January 31, 1928, c. 14, 45 Stat. 54, and April 26, 1928, c. 440, 45 Stat. 466.

[2] Formerly § 5356 Rev. Stat. and §§ 272 and 287 Criminal Code, Act March 4, 1909, c. 321, 35 Stat. 1088.

[3] Formerly § 25, Act June 30, 1834, c. 161, 4 Stat. 729, and § 2145, Rev. Stat.

[4] C. 310, 36 Stat. 557.

[5] February 16, 1911, 36 Stat. 1454; August 21, 1911, 37 Stat. 39.

360

equal footing with the original States." Compliance with stated conditions was made a prerequisite to the admission, and these conditions were complied with. The admission became effective through a proclamation of the President on January 6, 1912.[6] One of the conditions related to Indians and Indian lands and to the respective relations thereto of the United States and the State. The provisions embodying this condition are copied in an appended note.[7]

The lands of the Pueblo of Isleta, like those of other pueblos of New Mexico, are held and occupied by the people of the pueblo in communal ownership under a grant which was made during the Spanish sovereignty,

---

[6] 37 Stat. 1723.

[7] Section 2 of the enabling act prescribed that the convention called to form a constitution for the proposed State should provide by ordinance made a part of the constitution—

"First. That . . . the sale, barter, or giving of intoxicating liquors to Indians and the introduction of liquors into Indian country, which term shall also include all lands now owned or occupied by the Pueblo Indians of New Mexico, are forever prohibited.

"Second. That the people inhabiting said proposed State do agree and declare that they forever disclaim all right and title . . . to all lands lying within said boundaries owned or held by any Indian or Indian tribes the right or title to which shall have been acquired through or from the United States or any prior sovereignty, and that until the title of such Indian or Indian tribes shall have been extinguished the same shall be and remain subject to the disposition and under the absolute jurisdiction and control of the Congress of the United States; . . . but nothing herein . . . shall preclude the said State from taxing, as other lands and other property are taxed, any lands and other property outside of an Indian reservation owned or held by any Indian, save and except such lands as have been granted or acquired as aforesaid or as may be granted or confirmed to any Indian or Indians under any Act of Congress, but . . . all such lands shall be exempt from taxation by said State so long and to such extent as Congress has prescribed or may hereafter prescribe.

. . . . . .

"Eighth. That whenever hereafter any of the lands contained within Indian reservations or allotments in said proposed State shall be

was recognized during the Mexican dominion and has since been confirmed by the United States.

The people of these pueblos, although sedentary rather than nomadic, and disposed to peace and industry, are Indians in race, customs and domestic government. Always living in separate communities, adhering to primitive modes of life, largely influenced by superstition and fetichism, and chiefly governed according to crude customs inherited from their ancestors, they are essentially a simple, uninformed and dependent people, easily victimized and ill-prepared to cope with the superior intelligence and cunning of others. By a uniform course of action, beginning as early as 1854 and continued up to the present time, the legislative and executive branches of the Government have regarded and treated them as dependent Indian communities requiring and entitled to its aid and protection, like other Indian tribes.[8]

In 1904 the territorial court, finding no congressional enactment expressly declaring these people in a state of tutelage or assuming direct control of their property, held their lands taxable like the lands of others.[9] But Congress quickly forbade such taxation by providing:[10]

" That the lands now held by the various villages or pueblos of Pueblo Indians, or by individual members thereof, within Pueblo reservations or lands, in the Territory of New Mexico, and all personal property furnished

---

allotted, sold, reserved, or otherwise disposed of, they shall be subject for a period of twenty-five years after such allotment, sale, reservation, or other disposal to all the laws of the United States prohibiting the introduction of liquor into the Indian country; and the terms ' Indian ' and ' Indian country ' shall include the Pueblo Indians of New Mexico and the lands now owned or occupied by them."

[8] See United States v. Sandoval, 231 U.S. 28, and United States v. Candelaria, 271 U.S. 432, where the matters bearing on the history, characteristics, status and past treatment of the Pueblo Indians of New Mexico are extensively stated and reviewed.

[9] Territory v. Delinquent Taxpayers, 12 N.M. 139; 76 Pac. 307.

[10] Act March 3, 1905, c. 1479, 33 Stat. 1048, 1069.

said Indians by the United States, or used in cultivating said lands, and any cattle and sheep now possessed or that may hereafter be acquired by said Indians shall be free and exempt from taxation of any sort whatsoever, including taxes heretofore levied, if any, until Congress shall otherwise provide."

In 1907 the territorial court, for a like reason, held that the Pueblo Indians were not wards of the Government in the sense of the legislation forbidding the sale of intoxicating liquor to Indians and its introduction into the Indian country.[11] But that decision was soon followed by the declaration, in the enabling act of 1910, that "the terms 'Indian' and 'Indian country' shall include the Pueblo Indians of New Mexico and the lands now owned or occupied by them." And in 1924 Congress, in taking measures to protect these Indians in their land titles, expressly asserted for the United States the status and powers belonging to it "as guardian of said Pueblo Indians."[12]

In *United States* v. *Sandoval*, 231 U.S. 28, this Court, after full examination of the subject, held that the status of the Indians of the several pueblos in New Mexico is that of dependent Indian tribes under the guardianship of the United States and that by reason of this status they and their lands are subject to the legislation of Congress enacted for the protection of tribal Indians and their property. We there said (pp. 45, 46):

"Not only does the Constitution expressly authorize Congress to regulate commerce with the Indian tribes, but long continued legislative and executive usage and an unbroken current of judicial decisions have attributed to the United States as a superior and civilized nation the power and the duty of exercising a fostering care and protection over all dependent Indian communities within its

[11] *United States* v. *Mares*, 14 N.M. 1; 88 Pac. 1128.
[12] Act June 7, 1924, c. 331, 43 Stat. 636.

borders, whether within its original territory or territory subsequently acquired, and whether within or without the limits of a State. . . .

"Of course, it is not meant by this that Congress may bring a community or body of people within the range of this power by arbitrarily calling them an Indian tribe, but only that in respect of distinctly Indian communities the questions whether, to what extent, and for what time they shall be recognized and dealt with as dependent tribes requiring the guardianship and protection of the United States are to be determined by Congress and not by the courts."

We then pointed out that neither their citizenship, if they are citizens, nor their communal ownership of the full title in fee simple is an obstacle to the exercise of such guardianship over them and their property. We also there disapproved and declined to follow the decision in the early case of *United States* v. *Joseph,* 94 U.S. 614, relating to these Indians, because it was based upon reported data which in the meantime had been found to be at variance with recognized sources of information and with the long continued action of the legislative and executive departments.

In *United States* v. *Candelaria,* 271 U.S. 432, we were called upon to determine whether the people of a pueblo in New Mexico were a "tribe of Indians" within the meaning of § 2116 of the Revised Statutes, declaring that no purchase of lands "from any Indian nation or tribe of Indians" shall be of any validity unless made with specified safeguards; and the conclusion to which we came, and the reasons for it, are shown in the following excerpt from the opinion (pp. 441, 442):

"This provision was originally adopted in 1834, c. 161, sec. 12, 4 Stat. 730, and, with others 'regulating trade and intercourse with the Indian tribes,' was extended over 'the Indian tribes' of New Mexico in 1851, c. 14, sec. 7, 9 Stat. 587.

" While there is no express reference in the provision to Pueblo Indians, we think it must be taken as including them. They are plainly within its spirit and, in our opinion, fairly within its words, ' any tribe of Indians.' Although sedentary, industrious and disposed to peace, they are Indians in race, customs and domestic government, always have lived in isolated communities, and are a simple, uninformed people, ill-prepared to cope with the intelligence and greed of other races. It therefore is difficult to believe that Congress in 1851 was not intending to protect them, but only the nomadic and savage Indians then living in New Mexico. A more reasonable view is that the term ' Indian tribe ' was used in the acts of 1834 and 1851 in the sense of ' a body of Indians of the same or a similar race, united in a community under one leadership or government, and inhabiting a particular though sometimes ill-defined territory.' *Montoya* v. *United States,* 180 U.S. 261, 266. In that sense the term easily includes Pueblo Indians."

Section 217 now being considered, like the section considered in that case, was originally a part of the act of 1834. One speaks of " Indian country " and the other of an " Indian nation or tribe of Indians." The act as a whole makes it apparent that the term " Indian country " was intended to include any unceded lands owned or occupied by an Indian nation or tribe of Indians, and the term continues to have that meaning, save in instances where the context shows that a different meaning is intended.[18] Nothing in any of the statutes now being considered requires that it be given a different meaning in this instance.

It follows from what has been said that the people of the Pueblo of Isleta are Indian wards of the United States; that the lands owned and occupied by them under

[18] *Clairmont* v. *United States,* 225 U.S. 551, 557, *et seq.; Donnelly* v. *United States,* 228 U.S. 243, 268; *United States* v. *Pelican,* 232 U.S. 442, 447, *et seq.; United States* v. *Ramsey,* 271 U.S. 467, 470, *et seq.*

their ancient grant are Indian country in the sense of § 217; that the United States, in virtue of its guardianship, has full power to punish crimes committed within the limits of the pueblo lands by or against the Indians or against their property—even though, where the offense is against an Indian or his property, the offender be not an Indian [14]—and that the statutes in question, rightly construed, include the offense charged in the indictment.

There is nothing in the enabling act which makes against the views here expressed. True, it declares, in keeping with the constitutional rule, that the State shall be admitted into the Union on an equal footing with the original States. But the principle of equality is not disturbed by a legitimate exertion by the United States of its constitutional power in respect of its Indian wards and their property.[15]

As the District Court's judgment rested upon a mistaken construction of the statutes the judgment cannot stand.

*Judgment reversed.*

---

[14] *Donnelly* v. *United States,* 228 U.S. 243, 271–272; *United States* v. *Pelican,* 232 U.S. 442, 448, 451; *United States* v. *Ramsey,* 271 U.S. 467, 469.

[15] *United States* v. *Sandoval,* 231 U.S. 28, 49.