**BUTLER v. THOMPSON, Central Registrar et al.**

**Civ. A. 473.**

United States District Court
E. D. Virginia, Alexandria D.

Feb. 19, 1951.

John Locke Green, Frank L. Ball, J. Foster Hagan, all of Arlington, Va., for plaintiff.

John W. Jackson, Arlington, Va., J. Lindsay Almond, Jr., Atty. Gen. of Va., Walter E. Rogers, Asst. Atty. Gen. of Va., for defendants.

Before DOBIE, Circuit Judge, and HUTCHESON, Chief Judge and BRYAN, District Judges.

DOBIE, Circuit Judge.

Jessie Butler (hereinafter called Butler) instituted a civil action in the United States District Court for the Eastern District of Virginia against Mary A. Thompson (here-

inafter called Thompson), Central Registrar of the County of Arlington, Virginia, and against various other election officials. Butler asked the court to direct Thompson to register her as a duly qualified voter so that Butler might be permitted to vote in an election then imminent and Butler further asked the court to compel the other defendants, who were election officials, to permit Butler to vote in future elections. Damages in the sum of $5,000 were asked for the refusal of Thompson to register Butler, on the ground that this refusal was wilful and illegal.

The District Judge decided that "the case made by the complaint did not authorize the convening of a three-judge court, because there was no substantial Constitutional or Federal question presented by the complaint" and that "the said complaint does not state a cause of action for the recovery of damages." The complaint was, accordingly, dismissed by the District Court. On appeal, the United States Court of Appeals for the Fourth Circuit reversed the District Court and in a per curiam opinion, 184 F.2d 526, 527 stated:

"There was error in refusing to take appropriate action for convening a statutory court of three judges to hear the case, as substantial constitutional questions were unquestionably involved. We do not here attempt to pass upon these questions, as they are matters for the judgment of the three judge District Court, with review thereof, if any, by the Supreme Court of the United States.

"The judgment dismissing the action will be reversed, and the case will be remanded to the District Court, with direction that a court of three judges be constituted as required by statute to pass upon the questions involved."

The plaintiff here alleged in her complaint that she is a member of the Negro race; that she now is, and for many years has been, a resident of Arlington County, Virginia; that on December 15, 1949, she presented herself duly at the office of Mary Thompson, Central Registrar of the County of Arlington, Virginia, and demanded that she be registered so that she could vote in the general election of 1950 and future elections; and that Thompson refused to register plaintiff on the ground that plaintiff had not, as is required by Virginia law, paid her poll tax for the three preceding years. The complaint alleged that, apart from the payment of her poll taxes, plaintiff was in every way qualified to register under the Virginia law as a voter.

The complaint further alleged that the requirement of the payment of a poll tax as a prerequisite to voting was one of the provisions inserted in the Virginia Constitution of 1902, § 21, for the express purpose of denying to Negro citizens the right of suffrage; that it is now being administered in such way as to discriminate against Negroes; that the election officials of Virginia have conspired to administer the election laws of the State so as to disfranchise Negroes. Accordingly, it is alleged, the franchise provisions of the Virginia Constitution of 1902 and the Tax Code of Virginia violate the Virginia Constitution of 1867, the Act of Congress of 1870, 16 Stat. 62, admitting Virginia to representation in Congress, and the Fourteenth and Fifteenth Amendments to the Constitution of the United States.

At the hearing before the three-judge court, plaintiff, in addition to filing numerous exhibits which were chiefly statistical and are later discussed, introduced three witnesses, all officials of the State of Virginia: Messrs. Shepherd (Deputy Treasurer of Arlington County), Clements (Sheriff of Arlington County), and Trice (Deputy Sheriff of Arlington County). Not one shred or scintilla of evidence was evoked from these three witnesses that even had a tendency to support the plaintiff's contentions. Indeed, the only testimony given by these witnesses of any consequence whatever was that of Trice, who, on cross-examination, testified that to the best of his knowledge, the practices and procedure in administering the poll tax laws as prerequisites to voting were precisely the same as to Negroes and white persons and that he knew of no instance of administering these laws so as to discriminate against Negroes. Plaintiff Butler did not testify.

Defendants introduced only one witness, the defendant Thompson, Central Registrar of Arlington County. Her appearance, her manner of testifying, her frankness and candor made an unusually favorable impression on this court. She testified that, as alleged, the plaintiff Butler did appear before her and that she refused to register plaintiff solely because the plaintiff had not paid her poll taxes as is required by Virginia law. She further testified that she offered to register plaintiff if plaintiff would pay the required poll taxes. Thompson's testimony also supported that of Deputy Sheriff Trice that practices and procedures of her office were precisely the same as to both Negroes and white persons and that, both as to plaintiff and others offering to register, there was no discrimination whatever against members of the Negro race.

Plaintiff here bases her case on three contentions: (1) the poll tax requirements for voting in Virginia are invalid because Virginia is prohibited by the Act of Congress of January 26, 1870, from imposing such requirements; (2) these requirements are invalid because of the evil motives of the draftsmen of the Virginia Constitution of 1902 and subsequent poll tax statutes of Virginia; and (3) the Virginia Constitution and subsequent poll tax statutes are invalid because, even if these be fair on their face and seemingly non-discriminatory against Negroes, these are administered by the taxing and voting officers of the State of Virginia in such manner as to discriminate against Negroes.

■ We find no merit in this first contention of plaintiff. This Act of Congress, so far as relevant here, provides:

"* * * the State of Virginia is admitted to representation in Congress as one of the States of the Union upon the following fundamental conditions:

"First, That the Constitution of Virginia shall never be so amended or changed as to deprive any citizen or class of citizens of the United States of the right to vote who are entitled to vote by the Constitution herein recognized, except as punishment for such crimes as are now felonies at common law, whereof they shall have been duly convicted under laws equally applicable to all the inhabitants of said State: Provided, That any alteration of said Constitution, prospective in its effects, may be made in regard to the time and place of residence of voters." 62 Stat. 62.

"Provided, that no amendment or revision shall be made which shall deny or in any way impair the right of suffrage, or any civil or political right as conferred by this constitution, except for causes which apply to all persons and classes without distinction." Const.Va.1870, art. 12.

It is extremely doubtful, even if Virginia has violated the conditions of this Act of Congress in Virginia's poll Tax laws, whether this presents a question justiciable in the courts. Such a matter is one peculiarly within the domain of Congress itself, since it only purports to set up a condition governing Virginia's right *to admission to representation in Congress.* If the establishment of the requirement of the payment of a poll tax as a prerequisite to the right to vote were to be considered as a violation of the condition prescribed in the Act of 1870, it would be a matter peculiarly within the domain of the Congress alone. Such condition, if it be such, might well be considered as waived by Congress in view of the fact that Virginia has continued to be admitted to representation in Congress for a period of nearly half a century after the adoption of the poll tax requirement, and with this increasing representation in accordance with the increase in population. The Act of 1870, too, must be studied against the background of the Tragic Era of which it was a part.

■ Nor was this Act a compact under which Virginia, after the Civil War, was readmitted to the Union. The Supreme Court has ruled that the Confederate States were never out of the Union and, hence, there was no necessity for readmission. State of Texas v. White, 7 Wall. 700, 74 U.S. 700, 19 L.Ed. 227.

■ This Act does not attempt to place Virginia in a strait-jacket so far as the election laws of Virginia are concerned. If the Act made that attempt, the Act would be invalid. All states, after their

admission into the Federal Union, stand upon equal footing and the constitutional duty of guaranteeing each state a republican form of government gives Congress no power in admitting a state to impose restriction which would operate to deprive that state of equality with other states. See, particularly, Coyle v. Smith, 221 U.S. 559, 570, 573, 31 S.Ct. 688, 55 L.Ed. 853. And see, also, United States v. Chavez, 290 U.S. 357, 365, 54 S.Ct. 217, 78 L.Ed. 360; Hawkins v. Bleakly, 243 U.S. 210, 211, 37 S.Ct. 255, 61 L.Ed. 678; Stearns v. State of Minnesota, 179 U.S. 223, 244–245, 21 S.Ct. 73, 45 L.Ed. 162. So that, even if this Act of 1870 be valid and enforceable in the courts, which is open to dispute, still, the Virginia Constitution and the Virginia Election laws have not been amended since 1870 to deprive the Negroes, as a class of citizens, of the right to vote.

■ To plaintiff's second contention—that the draftsmen of the Virginia Constitutional Convention were prompted by evil motives and that this alone invalidates the provisions of this Constitution and subsequent Virginia laws requiring the payment of poll taxes as a prerequisite to voting—there are many answers.

It is admitted that some of the most vocal and violent members of that Convention expressed a desire and purpose to eliminate the Negro as a voter in Virginia. Yet even the most violent of these also expressed an intention to bring about this result by means that were valid under the Federal Constitution or Federal laws. And the expressions of these few can hardly be taken as necessarily voicing the dominant spirit of that Convention. For other voices were raised in the Convention to advance ideas couched in quite a different key.

Again we are not proceeding entirely under the 1902 Constitution. There was a general revision of the Virginia Constitution ratified by the voters in June, 1928. This revision and subsequent statutes have eliminated many of the most objectionable features contained in the Constitution of 1902. Gone, for example, is the bad "Understanding Clause", by which many Negroes were unquestionable disfranchised.

See, Davis v. Allen, 157 Va. 84, 160 S.E. 85, 769 A.L.R. 1234. So we cannot attribute to the draftsmen of the 1928 Constitution and all legislature subsequent to 1902, the same motives (whatever these motives and however evil) which activated the members of the Constitutional Convention of 1902.

■ Finally, in this connection, it is well settled that a law that is fair on its face and is also fairly administered is not rendered invalid by the evil motives of its draftsmen. In Soon Hing v. Crowley, 113 U.S. 703, 710–711, 5 S.Ct. 730, 734, 28 L.Ed. 1145, Mr. Justice Field declared: "And the rule is general, with reference to the enactments of all legislative bodies, that the courts cannot inquire into the motives of the legislators in passing them, except as they may be disclosed on the face of the acts, or inferrible from their operation, considered with reference to the condition of the country and existing legislation. The motives of the legislators, considered as to the purposes they had in view, will always be presumed to be to accomplish that which follows as the natural and reasonable effect of their enactments. Their motives, considered as the moral inducements for their votes, will vary with the different members of the legislative body. The diverse character of such motives, and the impossibility of penetrating into the hearts of men and ascertaining the truth, precludes all such inquiries as impracticable and futile. And in the present case, even if the motives of the supervisors were as alleged, the ordinance would not be thereby changed from a legitimate police regulation, unless in its enforcement it is made to operate only against the class mentioned; * * *." See, also, the opinion of Mr. Justice (afterwards Chief Justice) Stone in Sonzinsky v. United States, 300 U.S. 506, 513–514, 57 S.Ct. 554, 81 L.Ed. 772. In Williams v. State of Mississippi, 170 U.S. 213, 225, 18 S.Ct. 583, 588, 42 L.Ed. 1012, Mr. Justice McKenna said: "This comment is not applicable to the constitution of Mississippi and its statutes. They do not on their face descriminate between the races, and it has not been shown that their actual administration was evil; only that evil was possible under them." See, Too, United States

v. Des Moines Navigation & Railway Co., 142 U.S. 510, 12 S.Ct. 308, 35 L.Ed. 1099.

This brings us to plaintiff's third contention—that the poll tax laws of Virginia, as prerequisites to voting, though fair on their face, are administered in such a manner as to discriminate against Negroes.

■ That such a law both fair on its face and also fairly administered does not offend the Federal Constitution is well settled. We quote from the opinion of Circuit Judge Soper (speaking for the Circuit Court of Appeals for the Fourth Circuit) in Saunders v. Wilkins, 152 F.2d 235, 237:

" * * * the decisions generally hold that a State statute which imposes a reasonable poll tax as a condition of the right to vote does not abridge the privileges or immunities of citizens of the United States which are protected by the Fourteenth Amendment. The privilege of voting is derived from the State and not from the national government. The qualification of voters in an election for members of Congress is set out in Article 1, Section 2, Clause 1 of the Federal Constitution which provides that the electors in each State shall have the qualifications requisite for electors of the most numerous branch of the State Legislature. The Supreme Court in Breedlove v. Suttles, 302 U.S. 277, 283, 58 S.Ct. 205, 82 L.Ed. 252, held that a poll tax prescribed by the Constitution and statutes of the State of Georgia did not offend the Federal Constitution. The court said (302 U.S. 277 at page 283, 58 S.Ct. at page 208, 82 L.Ed. 252):

" 'To make payment of poll taxes a prerequisite of voting is not to deny any privilege or immunity protected by the Fourteenth Amendment. Privilege of voting is not derived from the United States, but is conferred by the state and, save as restrained by the Fifteenth and Nineteenth Amendments and other provisions of the Federal Constitution, the state may condition suffrage as it deems appropriate. Minor v. Happersett, 21 Wall. 162, 170 et seq., 22 L.Ed. 627; Ex parte Yarbrough, 110 U.S. 651, 664–665, 4 S.Ct. 152, 28 L.Ed. 274; McPherson v. Blacker, 146 U.S. 1, 37–38, 13 S.Ct. 3, 36 L.Ed. 869; Guinn v. United States, 238 U.S. 347, 362, 35 S.Ct. 926, 59 L.Ed. 1340.' "

Equally clear is the principle that such laws, though fair on their face, are invalid if they are so administered as to effect a clear discrimination against Negroes. The Classic expression of this view is found in the celebrated opinion of Mr. Justice Matthews in the well known case, involving discrimination against Chinese laundrymen, of Yick Wo v. Hopkins, 118 U.S. 356, 373–374, 6 S.Ct. 1064, 1073, 30 L.Ed. 220:

"For the cases present the ordinances in actual operation, and the facts shown establish and administration directed so exclusively against a particular class of persons as to warrant and require the conclusion that, whatever may have been the intent of the ordinances as adopted, they are applied by the public authorities charged with their administration, and thus representing the state itself, with a mind so unequal and oppressive as to amount to a practical denial by the state of that equal protection of the laws which is secured to the petitioners, as to all other persons, by the broad and benign provisions of the fourteenth amendment to the constitution of the United States. Though the law itself be fair on its face, and impartial in appliance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution. This principle of interpretation has been sanctioned by this court in Henderson v. Mayor of New York, 92 U.S. 259 [23 L.Ed. 543]; Chy Lung v. Freeman, 92 U.S. 275 [23 L.Ed. 550]; Ex parte [State of] Virginia, 100 U.S. 339 [25 L.Ed. 676]; Neal v. Delaware, 103 U.S. 370 [26 L.Ed. 567]; and Soon Hing v. Crowley, 113 U.S. 703, 5 S.Ct. 730 [28 L.Ed. 1145]." Equally emphatic were the words of Mr. Justice Frankfurter in Lane v. Wilson, 307 U.S. 268, 275, 59 S.Ct. 872, 876, 83 L.Ed. 1281: "We therefore cannot avoid passing on the merits of plaintiff's constitutional claims. The reach of the

Fifteenth Amendment against contrivances by a state to thwart equality in the enjoyment of the right to vote by citizens of the United States regardless of race or color, has been amply expounded by prior decisions. * * * The Amendment nullifies sophisticated as well as simple-minded modes of discrimination. It hits onerous procedural requirements which effectively handicap exercise of the franchise by the colored race although the abstract right to vote may remain unrestricted as to race." See, also, Mitchell v. Wright, 5 Cir., 154 F.2d 924.

■ Has plaintiff, then established the fact that the Virginia Constitutions and laws making the payment of poll taxes a prerequisite to voting have been administered in such a manner as to discriminate against Negroes? We think not.

We have already adverted to the fact that the oral evidence introduced before us failed utterly to show any discrimination against Negroes in the administration of the Virginia poll tax laws as a prerequisite to voting. This brings us to a consideration of the exhibits filed by plaintiff, which consist principally of statistics showing, as to the counties and cities of Virginia, the number of white persons and Negroes over the age of twenty-one years and the number of white persons and Negroes assessed for capitation taxes during the tax year 1940.

As might be expected, the percentage of Negroes over twenty-one years of age who were assessed for poll taxes varies widely in different cities and counties of Virginia. A few examples taken from the Eight Congressional District, which includes Arlington County, will illustrate this. Thus, in Goochland County, we find this percentage of Negroes assessed for poll taxes is very high, as out of a total Negro population of 2,270 over the age of twenty-one years, 2,244 were assessed and only 26 were not assessed; while Orange County reveals a correspondingly low percentage with only 506 Negroes assessed and 1,324 not assessed. The City of Charlottesville showed 2,506 Negroes assessed with only 142 not assessed; the City of Alexandria showed 1,987 Negroes assessed, and 1,459 not as-

sessed. In the whole State of Virginia, approximately 61% of the total number of Negroes over twenty-one years old were assessed for poll taxes; approximately 76% of the white persons in the same category were assessed. The situation in the Eight Congressional District is about the same as in the whole State of Virginia.

■ Certainly we cannot declare the Virginia poll tax laws invalid solely on these statistics upon the assumption that a difference of 15% in poll tax assessments between the Negroes and white persons warrants the conclusion that there is obvious discrimination in the administration of Virginia Poll tax laws against the Negroes for the purpose of preventing Negroes from voting. And it is not difficult to discover many other reasons why fewer Negroes than white persons are assessed for poll taxes in Virginia.

Among the sources from which Virginia Commissioners of Revenue obtain the names of persons assessable for poll taxes are city directories, telephone directories, automobile licenses, recorded deeds and property assessments. Manifestly, from these sources would be gleaned a much higher percentage of white persons than of Negroes.

Defendants had in the court-room several Registrars and Commissioners of Revenue who were prepared to testify that the practices of their offices, in connection with the administration of the poll tax laws as prerequisites to voting, were uniform as to white and colored persons, with no discrimination against the colored race. By consent of counsel on both sides, these witnesses were excused from testifying orally, in the light of stipulation 8 and 10, signed by counsel for both plaintiff and defendants. These two stipulations are herewith set out:

"8. Attached hereto is a folder marked 'Exhibit #4' containing letters from Commissioners of the Revenue of counties and cities throughout the Commonwealth of Virginia regarding the practices followed by them in assessing capitation taxes. It is stipulated and agreed that if said Commissioners of the Revenue were called as witnesses on behalf of the defendants, they

would testify under oath that the facts are as set out in their respective letters.

\* \* \* \* \* \*

10. Registrars generally throughout the State, if called as witnesses on behalf of the defendants would testify under oath that it was their practice, without discrimination as to race or color, to inform applicants for registration who are ineligible because of failure to pay their capitation taxes, if they apply to the Commissioner of the Revenue for assessment and pay the Treasurer the capitation taxes assessable against such applicants for the three years next preceding, they will be registered upon presentation of evidence that they have paid such taxes."

Statistics clearly prove that very few persons in Virginia pay poll taxes except as an incident to other taxes, such as property taxes and income taxes. We quote, however, from Section 58–1163 of the Virginia Code, which provides a ready means for any person so desiring to pay poll taxes and thereby become eligible to vote in elections: "Any person assessable with capitation taxes for any year or years, who has not been assessed therewith, and any person who shall be assessable with such taxes for the ensuing year by reason of his becoming of age after the first of January in any year may apply to the commissioner of the revenue for the county or city in which he resides and have himself assessed with such omitted capitation taxes or with such capitation taxes as shall become assessable against him for the ensuing year by reason of his becoming of age after the first of January in any year. The commissioner of the revenue shall assess such person with such omitted capitation taxes or with such capitation taxes as will become assessable against him for the ensuing year by reason of his becoming of age after the first of January in any year and give such person a certificate of such assessment." There is not a shred of evidence in the record of this case showing either that any Negro so applying has been refused assessment or that any white person, duly assessable, has been permitted to vote without the payment of poll taxes. Nor does this record disclose, as plaintiff asserts, studied efforts on the part of Virginia tax officials to assess and compel white persons to pay capitation taxes so that they can vote and an equally studied failure on the part of these officials to do the same in the case of Negroes.

Plaintiff Butler was duly assessed for poll taxes for ten years. She paid none of these taxes. When she applied to Registrar Thompson for registration, she was told that she could not be registered without the payment of the requisite poll taxes but that she would be registered if she would pay these taxes. Plaintiff was thus duly informed of her rights. A similar answer would have been given, and has often been given, to a white person in the same situation as plaintiff. How, then, can this plaintiff maintain that she personally has been discriminated against by virtue of her race, and how, then, can she properly bring a civil action based on race discrimination on behalf of herself and, as a class action, on behalf of others similarly situated?

Said Mr. Justice Holmes in Collins v. State of Texas, 223 U.S. 288, 295–296, 32 S.Ct. 286, 288, 56 L.Ed. 439: "If he has not suffered, we are not called on to speculate upon other cases, or to decide whether the followers of Christian Science or other people might, in some event, have cause to complain." In like manner, in Murphy v. State of California, 225 U.S. 623, 630–631, 32 S.Ct. 697, 699, 56 L.Ed. 1229, Mr. Justice Lamar pointed out "If, as argued, there is no reasonable basis for making a distinction between hotels with twenty-five rooms and those with twenty-four rooms or less, the plaintiff in error is not in position to complain, because, not being the owner of one of the smaller sort, he does not suffer from the alleged discrimination." See, also, Stephenson v. Binford, 287 U.S. 251, 277–278, 53 S.Ct. 181, 77 L.Ed. 288; United States v. Wurzbach, 280 U.S. 396, 399, 50 S.Ct. 167, 74 L.Ed. 508.

■ There is a primary presumption of the constitutionality of a State statute in the light of the Federal Constitution and a strong showing must be made by the party attacking the constitutionality of the statute. United States v. Southeastern Underwriters Ass'n, 322 U.S. 533, 64 S.Ct. 1162,

88 L.Ed. 1440; Osborn v. Ozlin, 310 U.S. 53, 60 S.Ct. 758, 84 L.Ed. 1074; Merchants Mutual Automobile Liability Co. v. Smart, 267 U.S. 126, 45 S.Ct. 320, 69 L.Ed. 538; La Tourette v. McMaster, 248 U.S. 465, 39 S.Ct. 160, 63 L.Ed. 362. We think no such showing has been made by plaintiff in the instant case.

Plaintiff has sought not only equitable remedies but also damages for the alleged illegal refusal of defendant Thompson to register her as a voter. And a jury trial was asked by plaintiff on the question of damages. We had some doubt as to whether the three-judge court, after concluding that the legislative provisions of Virginia prescribing the payment of poll taxes as a prerequisite to voting were valid and that the equitable relief must be denied, had power to dismiss wholly this civil action, including the claim for damages. Happily, however, counsel for both plaintiff and defendants have agreed, and so informed the court, that if these poll tax provisions are found by us to be valid, the whole civil action, including the claim for damages, may be dismissed. Since, as has been indicated, we find these provisions valid, we must therefore dismiss the plaintiff's suit.

This civil action of the plaintiff is dismissed.

Dismissed.