**Petition of Emil McCORD for a Writ of Habeas Corpus.**

**Petition of Andrew NICKANORKA for a Writ of Habeas Corpus.**
**Nos. A–13363, A–13364.**

District Court, Alaska,
Third Division, Anchorage.
May 15, 1957.

Russell E. Arnett, Jack F. Scavenius, Stanley J. McCutcheon, Buell A. Nesbett, Arthur D. Talbot, Clifford J. Groh, Wendell P. Kay, Roger Cremo, T. Stanton Wilson, Peter J. Kalamarides, Anchorage, Alaska, for petitioners.

Kaye Richey, Asst. U. S. Atty., Anchorage, Alaska, for respondent.

McCARREY, Jr., District Judge.

This matter comes before the court upon a petition for a writ of habeas corpus.

Emil McCord is being held to answer for statutory rape. It is charged that he, being a male person 23 years of age, did carnally know and abuse a female person under the age of 16 years, to wit, 14 years of age. Andrew Nickanorka is held to answer on the same charge. It is alleged that he, being a male person 29 years of age, did carnally know and abuse another female person under the age of 16 years, to wit, 14 years of age.

While being held in custody by the United States Marshal to answer to the Grand Jury, the petitioners filed habeas corpus proceedings before this court to obtain their release from the United States Marshal, upon the grounds that it is contrary to the law to hold them upon the territorial crime of statutory rape, in that title 18 U.S.C. § 1153, makes such a crime inapplicable to the act charged. The petitioners allege that they and the female victims are full-blooded Indians and that they all reside at Tyonek, Alaska, which is within the limits of an area set aside for their use by Executive Order No. 2141, issued in 1915.

There is no dispute as to the fact that the petitioners and the victims are full-blooded Indians and that they and their ancestors, for a long period of time, have resided in this area set aside by the order *supra*, which is administered by the Alaska Native Service, an administrative unit of the Bureau of Indian Affairs. Further, that the tribe is governed by a council elected at general meetings of the tribe.

One of the petitioners testified at the hearing that the chief of the tribe, one Simeon Chickalusion, died on Easter Sunday and as of this date the tribe has not called a meeting to elect a new chief. He further testified that there are six members of the council and that these members are chosen by a vote of the members at a general meeting called for that purpose. Some testimony was adduced from this witness to the effect that the chief and the council take action to correct any infractions of the law set up by the council. The witness referred specifically to the violation of fish location jumping, fishing being the principal source of livelihood and income of this Indian tribe, since fur trapping has virtually become extinct, due to the depletion of fur-bearing animals.

All of the inhabitants in that area, excepting one white school teacher who resides there a portion of the year, and a Hawaiian who is married to a member of the tribe, are all native Indians and members of the tribe.

The petitioners contend that the crimes alleged to have taken place were committed, if at all, within "Indian country" which is within the definition of 18 U.S.C. § 1151 et seq., and as a result thereof, they are outside the jurisdiction of the Territory of Alaska and its penal laws. Their additional argument is that

the crime of statutory rape is not within any of the crimes set forth in 18 U.S.C. § 1153, which is more commonly referred to as the "Ten Major Crimes" statute, applicable to Indian offenses within Indian country.

The Government, on the other hand, takes the position that Tyonek is not within "Indian country", as defined in 18 U.S.C. § 1151, and that Alaska natives are in a different position as concerns the jurisdiction of criminal offenses than the Indians in the United States proper. The Government further contends that, in any event, the crime of statutory rape is within the provisions of 18 U.S.C. § 1153.

The administration of criminal law in areas occupied by members of Indian tribal bodies has been the subject of prolonged legislative activity, extensively recited in the case of United States v. Jacobs, D.C.E.D.Wis.1953, 113 F.Supp. 203. Congress, for a considerable length of time, has removed the trial and punishment of criminal offenses from the courts of the states and territories of the United States within which the Indians are located and substituted federal jurisdiction over the major crimes and left the minor crimes to the tribal organization. United States v. Chavez, 1933, 290 U.S. 357, 54 S.Ct. 217, 78 L.Ed. 360. A number of reasons have been forwarded for this, two of which are covered in Ex parte Crow Dog, 1883, 109 U.S. 556, 3 S.Ct. 396, 27 L.Ed. 1030, perhaps the leading case on this subject. The Supreme Court there ruled that the courts of the Territory of Dakota had no jurisdiction over members of the Sioux tribe within Indian country, reasoning that their independent status, established by treaty, evidences a Congressional intent to relieve them of the rule of the Territory, and, second, that the tribes must be protected from the restraints of a society they do not understand and into which they have not yet become assimilated. A third reason is suggested in United States v. Chavez, 290 U.S. 357, at page 361, 54 S.Ct. 217, 78 L.Ed. 360, that the federal court system may afford the Indian protection from a frequently unfriendly and occasionally hostile community until the time arrives when he is more adequate to defend himself. Perhaps a fourth reason has been the reluctance of the state authorities to assume the government of a large and tax-free population within its borders. Whatever may be the determinative reason behind this policy, Congress has evidenced an intent to continue the existing system by revising the legislation pertaining to this subject in 1948. 62 Stat. 757; 63 Stat. 94. At the same time, however, recent enactments of Congress removing certain areas in certain states from the exclusive jurisdiction of the United States Courts (67 Stat. 588, 18 U.S.C. § 1162) indicate an intent to place Indian peoples within the same society as their white neighbors just as rapidly as they are able to adapt themselves to that society. It is certainly to be desired that a time will come when there is no need for this type of legislation, but that time must be determined by Congress, not by this court.

■ The principle issue presented at the hearing on the writ was whether the Tyonek area fits within the meaning of "Indian country" in 18 U.S.C. § 1153. The Act defines the term as:

"(a) all land within the limits of any Indian Reservation under the jurisdiction of the United States government * * * (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished * * *." 18 U.S.C. § 1151.

The Government's suggestion that the meaning of the terms is confined to lands reserved to the Indians by treaty is not compatible with this definition and their contention that the definition is as to areas within the several states seems also to be incorrect. The Supreme Court in the Chavez case, 290 U.S. 357, 54 S.Ct.

217, 220, defined the term "Indian country" as:

> " * * * any unceded lands owned or occupied by an Indian nation or tribe of Indians * * *."

I feel that this interpretation is broad enough to include an area, such as the Tyonek area, which is set aside and treated as Indian land, even though the executive order separating the land from the public domain fails to indicate its exact purpose. The Court of Appeals for this circuit has indicated that the recent amendments of the provisions applicable to these situations have served to enlarge the meaning of the term, rather than to diminish it. Williams v. U. S., 9 Cir., 1954, 215 F.2d 1; Guith v. U. S., 9 Cir., 1956, 230 F.2d 481. In this light, I think I am warranted in concluding that the Tyonek area is "Indian country".

■ The prosecution's argument that Alaska natives have a different status than Indians of the States is a rather novel concept which I regard as inaccurate. The district court in United States v. Kie, D.C.Alaska 1885, Fed.Cas. 15,528a, indicated that the Territory of of Alaska as a whole was not Indian country and that the natives of this area had not achieved independent status by treaty. With these observations I can concur, but I do not feel that this acts to remove them from the definitions of Congress otherwise applicable to them and not limited by the legislative pronouncement. See In re Sah Quah, D.C. Alaska 1886, 31 F. 327 in this regard. In view of the opinions expressed by these courts and the definition of Congress, however, any extension of the definition beyond those areas set apart from the public domain and dedicated to the use of the Indian people, and within which is found an operational tribal organization, would be unwarranted.

■ The next question is whether the crime of statutory rape is one of those crimes within the terms of 18 U.S.C. § 1153 of which the federal courts will take jurisdiction. The provision states:

> "Any Indian who commits against the person * * * of another Indian * * * any of the following offenses, namely * * * rape * * * shall be subject to the same laws and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States. As used in this section, the offense of rape shall be defined in accordance with the laws of the State in which the offense was committed * * *."

In United States v. Jacobs, D.C., 113 F.Supp. 203, the court concluded, after an extensive discussion of the Congressional activities concerning the provision cited, that it was not the intent of Congress to include the offense of statutory rape or carnal knowledge of a female under a certain age in those crimes enumerated in the Act. The same conclusion has been reached by the Supreme Court of Wisconsin in State v. Rufus, 1931, 205 Wis. 317, 237 N.W. 67. The reasoning adopted in these cases is quite convincing and the deletion of a proposed amendment to the Act which would have provided for this offense would certainly indicate that Congress preferred to leave this matter to the tribal courts. At any rate, as the Jacobs case states, any doubt in this direction must be rsolved in favor of the accused:

> "It is axiomatic that statutes creating and defining crimes cannot be extended by intendment, and that no act, however wrongful, can be punished under such a statute, unless clearly within its terms. There can be no constructive offenses, and before a man can be punished, his case must be plainly and unmistakably within the statute. [Citations.]" [113 F.Supp. 207]

We have no indication that the particular acts in question will subject the petitioners to punishment by the tribe. It is with interest that one observes the Indian race in the United States is fast advancing in the adoption of the white man's society. This is commendable and

the realization of a goal sought. A large part of our Indian population is at last shedding the distrusts and fear of our society which they have evidenced in the past. Many are entering commercial activities with their Caucasian neighbors. A small but encouraging number have entered the professions and our institutions of education are beginning to feel the influx of Indian students, which has been so long desired, but until recently, little realized. The records of the past series of armed conflicts in which the United States has engaged illustrates a most commendable achievement by members of the Indian elements of our population. In the interest of further acquainting the members of the tribe with the society with which they must soon become members, it would certainly be injudicious to allow the petitioners to escape without any sanctions applied to them. However, the sanctions to be applied by the chief and the council must be left to the tribe, in the absence of Congressional action. United States v. Quiver, 1916, 241 U.S. 602, 36 S.Ct. 699, 60 L.Ed. 1196.

Since it follows as a corollary that if the Indian people want to take advantage of the opportunities afforded them under our democracy, there must, of necessity, and corollary to these opportunities, follow the paralleling responsibility of abiding by the laws and precepts of government that have been adopted by the white race and which have made our democracy great. However, I cannot avoid agreeing with Judge Tehan in the Jacobs case, 113 F.Supp. 203, when he says:

"It may well be that the description of the Indian people set out in Ex parte Crow Dog [109 U.S. 556, 3 S.Ct. 396, 27 L.Ed. 1030] is no longer warranted, and that the time has come to make Indians subject to more of the laws governing other citizens or residents of the United States. But this is a matter for the legislature and not the courts. It is for Congress to change a policy that has been long established and has been repeatedly recognized by the courts."

This decision should not be interpreted by members of the native groups, be they Indian or Eskimo, as a general removal of the territorial penal authority over them, for the reason that this court will take judicial notice that there are few tribal organizations in Alaska that are functioning strictly within Indian country as defined in 18 U.S.C. § 1151 et seq. As I have said, only when the offense fits distinctly within the provisions of the applicable federal law will territorial jurisdiction be ousted. Testimony indicates that the Tyonek area, unlike most areas inhabited by Alaska natives, has been set aside for the use of and is governed by an operational tribal unit. Under these conditions, I can see no alternative but to order the release of the petitioners.