2004-NMCA-012

84 P.3d 670

**STATE of New Mexico, Plaintiff–Appellant,**

v.

**Del E. ROMERO, Defendant–Appellee.**

No. 22,836.

Court of Appeals of New Mexico.

Nov. 11, 2003.

Certiorari Granted No. 27,411, Jan. 20, 2004.

**54**

Patricia A. Madrid, Attorney General, Margaret McLean, Assistant Attorney General, Santa Fe, NM, for Appellant.

John B. Bigelow, Chief Public Defender, Laurel A. Knowles, Assistant Appellate Defender, Santa Fe, NM, for Appellee.

Lester K. Taylor, Stephen H. Greetham, Nordhaus, Haltom, Taylor, Taradash & Bladh, L.L.P., Albuquerque, NM, for Amicus Curiae, Taos Pueblo.

Frank A. Demolli, Pueblo of Pojoaque Legal Department, Santa Fe, NM, for Amicus Curiae, Pueblo of Pojoaque.

## OPINION

ALARID, Judge.

{1} This case presents a question of the State's jurisdiction to prosecute a member of Taos Pueblo charged with committing an aggravated battery upon another member of Taos Pueblo on land located within the original boundaries of the land grant from the King of Spain to Taos Pueblo, but which is now part of the town of Taos, New Mexico. We hold that by operation of federal law, the land on which the alleged crime occurred is no longer Indian country, and that the State has jurisdiction to prosecute Defendant.

## BACKGROUND

{2} Defendant–Appellee, Del E. Romero, was indicted by a Taos County grand jury on one count of aggravated battery, stemming from an incident at the Pueblo Allegre Mall in the town of Taos, New Mexico. Defendant moved to dismiss the charge against him on the ground that he is an Indian, that the Pueblo Allegre Mall is located in Indian country, and that New Mexico lacked subject matter jurisdiction to prosecute criminal charges against an Indian for an offense committed in Indian country. Defendant requested an evidentiary hearing on his motion to dismiss. The State filed a short response asserting that the Pueblo Allegre Mall is "within the geographical boundaries of the Town of Taos, and outside the exterior boundaries of the Taos Pueblo."

{3} The trial court held an evidentiary hearing. Defendant and the State stipulated that both Defendant and the alleged victim are members of Taos Pueblo. The evidence presented to the trial court included various maps of the town of Taos and the lands surrounding Taos Pueblo.

{4} Defendant, citing *State v. Ortiz*, 105 N.M. 308, 731 P.2d 1352 (Ct.App.1986), argued that federal law preempted state criminal jurisdiction in Indian country. According to Defendant, the Pueblo Allegre Mall is located on land that was owned by Taos Pueblo at the time New Mexico was admitted as a state, and therefore is included within the definition of Indian country set out in Article XXI, Section 8 of the New Mexico Constitution: "lands owned or occupied by

[the Pueblo Indians] on the twentieth day of June, nineteen hundred and ten, or which are occupied by them at the time of the admission of New Mexico as a state."

{5} The State, referring to a plat prepared by the Pueblo Lands Board, argued that Pueblo title to the tract on which the Pueblo Allegre Mall is located had been extinguished pursuant to the Pueblo Lands Act, ch. 331, 43 Stat. 636 (1924) (the PLA).

{6} In a letter decision, the trial court found that the Pueblo Allegre Mall is located on privately owned property within the town limits of Taos, in an area "within the original exterior boundaries of the Taos Pueblo Grant." The trial court further found that Pueblo title to the land underlying the Pueblo Allegre Mall was "extinguished" pursuant to the PLA. Applying *Ortiz*, the trial court held that extinguishment of Pueblo title pursuant to the PLA did not "diminish or change" the boundaries of Taos Pueblo. The trial court concluded that the State lacked subject matter jurisdiction. The trial court entered a separate order of dismissal, incorporating its letter decision.

{7} The State filed a timely notice of appeal.

**DISCUSSION**

{8} Under federal law, the United States has exclusive jurisdiction to prosecute certain serious offenses committed by Indians within Indian country. 18 U.S.C. § 1153 (2000); *Ortiz*, 105 N.M. at 310, 731 P.2d at 1354 (discussing exclusive federal jurisdiction under Major Crimes Act). There is no dispute that Defendant is an enrolled member of Taos Pueblo, and that the offense with which he is charged—aggravated battery causing serious bodily harm—is one of the offenses listed in § 1153. Further, as previously noted, the trial court found that the Pueblo Allegre Mall is located on privately owned property within the town limits of Taos, in an area "within the original exterior boundaries of the Taos Pueblo Grant," and that Pueblo title to the land underlying the Pueblo Allegre Mall was extinguished pursuant to the PLA. These findings are not attacked by either party to this appeal and we therefore accept them as operative facts for purposes of this appeal. This appeal ultimately turns upon a question of law: did extinguishment of the Pueblo title to the lands underlying the town of Taos pursuant to the PLA permanently change the jurisdictional status of this land? We conclude that it did, and that the 926 acres underlying the town of Taos as to which title was quieted against Taos Pueblo pursuant to the PLA are not Indian country. Accordingly, the State may prosecute Defendant for his alleged offense.

**Indian Country Defined**

{9} In 1948 Congress enacted the current definition of Indian country:

> "Indian country" ... means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States ..., and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

18 U.S.C. § 1151(2000). For the State to prevail, we must be persuaded that Pueblo Allegre Mall is not located within any of the three categories of lands comprising Indian country set out in § 1151.

{10} There is no serious question as to the inapplicability of Subsection (c). Allotment is a term of art in Indian law "referring to land owned by individual Indians and either held in trust by the United States or subject to a statutory restriction on alienation." *Felix S. Cohen's Handbook of Federal Indian Law* 40 (Rennard Strickland, et al., eds.1982) (hereinafter *"Cohen"*). The lands comprising the Taos Pueblo land grant are owned communally, and therefore are not allotments. *See United States v. Chavez*, 290 U.S. 357, 360, 54 S.Ct. 217, 78 L.Ed. 360 (1933) (observing that the lands of Isleta Pueblo, "like those of other pueblos of New Mexico" are owned communally).

{11} We are also satisfied that Subsection (a) is not applicable in the present case. At one time it was generally accepted, and we so held, that the categories of Indian

lands described in Subsections (a) and (b) were largely interchangeable for purposes of jurisdictional analysis. *Cohen* at 38; *Ortiz*, 105 N.M. at 310, 731 P.2d at 1354. However, that position is no longer tenable. In *Alaska v. Native Village of Venetie Tribal Government*, 522 U.S. 520, 118 S.Ct. 948, 140 L.Ed.2d 30 (1998), the United States Supreme Court held that dependent Indian communities "refers to a limited category of Indian lands that are *neither reservations* nor allotments." *Id.* at 527 (emphasis added). There can be no question that the Taos Pueblo land grant is a dependent Indian community: the very term "dependent Indian communities" was adopted in *United States v. Sandoval*, 231 U.S. 28, 34 S.Ct. 1, 58 L.Ed. 107 (1913), to describe New Mexico Pueblos. Indeed, "[t]he entire text of § 1151(b), and not just the term 'dependent Indian communities,' is taken virtually verbatim from *Sandoval*." *Venetie*, 522 U.S. at 530, 118 S.Ct. 948; *see also Cohen* at 34 (characterizing Subsection (b) as "codifying" the phrase "dependent Indian communities"). As a dependent Indian community the Taos Pueblo land grant by definition is not an Indian reservation.[1] Applying *Venetie*, we hold that if the situs of the alleged crime in this case is Indian country, it is by operation of Subsection 1151(b).

### The PLA

{12} Early decisions of the territorial supreme court and the United States Supreme Court held that Pueblo Indians of New Mexico, unlike other Indians, were not in a state of tutelage and that neither the Pueblo Indians nor their property were under the guardianship of the federal government. *E.g., United States v. Joseph*, 94 U.S. 614, 24 L.Ed. 295 (1876). As a result of these cases, it was understood that Pueblo Indians could convey good title to Pueblo lands notwithstanding federal law generally restricting the

alienation of Indian lands. *Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana*, 472 U.S. 237, 240–42, 105 S.Ct. 2587, 86 L.Ed.2d 168 (1985). "Relying on the rule established in *Joseph*, 3,000 non-Indians had acquired putative ownership of parcels of real estate located inside the boundaries of the Pueblo land grants." *Id.* at 243.

{13} In 1910 Congress enacted enabling legislation contemplating the admission of New Mexico as a state. New Mexico Enabling Act, ch. 310, 36 Stat. 557 (1910). As a condition of admission, Congress required the people of New Mexico to enact "an ordinance irrevocable without the consent of the United States and the people [of New Mexico]" recognizing that lands "now owned or occupied by the Pueblo Indians of New Mexico" were Indian country.[2] New Mexico Enabling Act, ch. 310, § 2, 36 Stat. at 558. In view of the *Joseph* decision, there was a substantial question as to whether Congress had the authority under the Indian Commerce Clause to define Pueblo lands as Indian country. In *Sandoval*, the United States Supreme Court upheld the Enabling Act as a valid exercise of Congress's power to regulate commerce with Indian tribes. The Court held that Pueblo Indians are "Indians" within the meaning of the Indian Commerce Clause and that the Pueblo Indians, like other Indians, were to be viewed as wards of the federal government. *Sandoval*, 231 U.S. at 46–47, 34 S.Ct. 1. The Supreme Court characterized Section 2 of the Enabling Act as having "prescribed, in substance, that the lands then owned or occupied by the Pueblo Indians should be deemed and treated as Indian country within the meaning of [federal law prohibiting the introduction of intoxicating liquor into Indian country] *and of kindred legislation by Congress.*" *Id.* at 36–37, 34 S.Ct. 1 (emphasis added; footnote omitted).

---

1. We are aware that the United States government has set aside public lands in trust for the benefit of the Indians of Taos Pueblo. Pub.L. 91–55o, 84 Stat. 1437 (1970). The present appeal does not concern a crime scene located within the limits of these additional lands.

2. In 1910, when Congress enacted the Enabling Act, the *Joseph* decision was still good law.

Thus, both Congress in enacting the Enabling Act and the people of New Mexico in acceding to its terms would not necessarily have understood "all lands *now* owned or occupied by the Pueblo Indians" to have included lands within the original Pueblo land grants that were then owned and occupied by non-Indians.

{14} *Sandoval's* holding that Pueblo Indians were wards of the federal government generally subject to federal laws governing Indians called into question the validity of the *Joseph* decision, and clouded the title of thousands of non-Indians who had acquired lands within the boundaries of the Pueblo land grants without the approval of the federal government. *Pueblo of Santa Ana,* 472 U.S. at 243–44, 105 S.Ct. 2587.

{15} Congress responded to the problem of claims by non-Indians to lands within Pueblo land grants by enacting the PLA. The PLA established the Pueblo Lands Board to investigate the state of title of lands within the boundaries of the various Pueblos, and provided a mechanism whereby Pueblo title to tracts of land could be extinguished in favor of non-Indian claimants under prescribed conditions. *Pueblo of Santa Ana,* 472 U.S. at 244–45, 105 S.Ct. 2587. The Secretary of the Interior was to file "field notes and plat for each [P]ueblo . . . showing the lands to which the Indian title has been extinguished." PLA, ch. 331, § 13, 43 Stat. at 640. Certified copies of these field notes were to be "accepted in any court as competent and conclusive evidence of the *extinguishment of all the right, title, and interest of the Indians in and to the lands so described . . . and of any claim of the United States in or to the same.*" *Id.* (emphasis added). A decree in favor of a non-Indian claimant pursuant to the PLA had "the effect of a deed of quitclaim as against the United States and said Indians." PLA, ch. 331, § 5, 43 Stat. at 637. Among the Pueblo lands as to which Pueblo title was extinguished by the PLA were 926 acres occupied by the town of Taos, which intruded into the southwest corner of the original Taos Pueblo grant. *See generally United States v. Pueblo of Taos,* 33 Ind. Cl. Comm. 82 (1974), *aff'd,* 207 Ct.Cl. 53, 515 F.2d 1404 (1975).

{16} Congress's provision in the PLA for the extinguishment of Pueblo title is particularly significant because prior to the enactment of § 1151 in 1948 "Indian lands were judicially defined to include only those lands in which the Indians held some form of property interest." *Solem v. Bartlett,* 465 U.S. 463, 468, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984). In 1834 Congress had enacted legislation regulating commerce with Indians. Ch. 161, 4 Stat. 729 (1834). Section 1 of the 1834 act contained the following definition of "Indian country":

> [A]ll that part of the United States west of the Mississippi, and not within the states of Missouri and Louisiana, or the territory of Arkansas, and, also, that part of the United States east of the Mississippi river, and not within any state *to which the Indian title has not been extinguished,* for the purposes of this act, be taken and deemed to be the Indian country.

4 Stat. 729 (emphasis added). Although Section 1 of the 1834 act was repealed in 1874, *Cohen* at 31, no new definition of Indian country was enacted until 1948,[3] and the United States Supreme Court continued to refer to the 1834 definition even after its repeal. *Clairmont v. United States,* 225 U.S. 551, 557, 32 S.Ct. 787, 56 L.Ed. 1201 (1912); *see also Cohen* at 35 (observing that "[t]he 1834 statutory definition of Indian country was expressly tied to Indian land title and the Supreme Court had not rejected this requirement before passage of [§ 1151]"). Relying on the 1834 definition of Indian country as lands "to which the Indian title has not been extinguished," the United States Supreme Court repeatedly stated that upon extinguishment of Indian title, status as Indian country ceases. *E.g., Bates v. Clark,* 95 U.S. 204, 24 L.Ed. 471 (1877). Extinguishment of Indian title restored the land in question to the jurisdiction of the state (or

---

**3.** Congress maintained a statutory linkage between Indian title and federal jurisdiction in the enabling acts for states admitted between 1889 and 1959. *See Washington v. Confederated Bands and Tribes of the Yakima Indian Nation,* 439 U.S. 463, 479–80, 99 S.Ct. 740, 58 L.Ed.2d 740 (1979). Typical of these acts, § 2 of the New Mexico Enabling Act provides "that until the title of such Indian or Indian tribes shall have been extinguished the same shall be and remain sub-

ject to the disposition and under the absolute jurisdiction and control of the congress of the United States." Although the dissent correctly notes that the "[t]he Enabling Act recognized federal dominance and governance over lands then held or occupied by Pueblo Indians," Dissent, ¶ 39, it overlooks the language in § 2 by which Congress expressly linked federal dominance and governance of Indian lands to nonextinguishment of Indian title.

territory) in which the land was located *without further action by Congress. Clairmont*, 225 U.S. at 558, 32 S.Ct. 787. This rule "govern[ed] in the absence of a different provision by treaty or by act of Congress." *Clairmont*, 225 U.S. at 559, 32 S.Ct. 787.

{17} Defendant and Amicus Taos Pueblo argue that in enacting the PLA Congress intended to extinguish title to Pueblo lands without altering their jurisdictional status. This argument "contradicts the common understanding of the time" that tribal ownership was a component of status as Indian country, *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 346, 118 S.Ct. 789, 139 L.Ed.2d 773 (1998), and that upon extinguishment of Indian title the land in question ceased to be Indian country without the necessity of further action by Congress, *Clairmont*, 225 U.S. at 558, 32 S.Ct. 787. We construe the PLA "in light of the common notions of the day and the assumptions of those who drafted [it]." *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 206, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978). We find nothing in the PLA suggesting that Congress intended to depart from the established rule that status as Indian country ceases upon extinguishment of Indian title. We conclude that in enacting the PLA, Congress clearly understood that it was altering the jurisdictional status of those lands as to which title was quieted in favor of a non-Indian, and that unless Congress subsequently acted to restore the Indian country status of these lands they remain outside Indian country.

### Effects of § 1151 on the Jurisdictional Status of Non–Indian Lands Within a Pueblo Land Grant

{18} Defendant argues that Indian title is no longer dispositive of status as Indian country. According to Defendant, § 1151 uncoupled status as Indian country from Indian title. The flaw in this argument is the erroneous assumption that Congress uncoupled Indian title and status as Indian country in all three categories of Indian country set out in § 1151.

{19} A close examination of § 1151 reveals that Congress has expressly uncoupled Indian title and status as Indian country only in Subsection (a). Subsection (a) codifies the holding of such cases as *Kills Plenty v. United States*, 133 F.2d 292 (1943), which had construed the phrase "within any Indian reservation" to confer federal criminal jurisdiction over crimes committed on land within reservation boundaries notwithstanding the fact that the crime scene was located on land that had been patented in fee to non-Indians. *See* § 1151, Historical and Statutory Notes. Some lower courts, however, had reached a contrary result. *Cohen* at 36. When Congress enacted § 1151 in 1948, it eliminated any doubt that Subsection (a) represents a statutory departure from the traditional rule tying status as Indian country to Indian title by adding the additional language, "all lands" and "notwithstanding the issuance of any patent." *Cohen* at 35, 37. However, any suggestion that Congress generally intended to abrogate the rule tying status as Indian country to Indian title is refuted by Subsection (c), which expressly maintains the linkage between Indian title and status as Indian country. *See Pittsburg & Midway Coal Mining Co. v. Yazzie*, 909 F.2d 1387, 1421–22 (10th Cir.1990) (recognizing that Congress has authorized "checkerboard jurisdiction" outside reservations in Subsections 1151(b) and (c)).

{20} Subsection (b) does not employ the phrases "all lands within the limits of any Indian reservation" and "notwithstanding the issuance of any patent" which accomplish the uncoupling of Indian title and status as Indian country in Subsection (a). As noted in *Venetie*, Subsection (b) is a codification of a different line of authority and is largely drawn from the Supreme Court's discussion of Pueblo Indians in *Sandoval*.

{21} We find support for the conclusion that Congress intended Subsection 1151(b) to maintain the linkage between Pueblo title and status as Indian country in the legislative history of the Santo Domingo Pueblo Claims Settlement Act of 2000. Pub.L. 106–425, 114 Stat. 1890 (2000) [codified at 25 U.S.C. §§ 1777 through 1777e (2000)](SDPCSA). Congress enacted the SDPCSA as enabling legislation for the settlement of longstanding disputes over lands claimed by Santo Domingo Pueblo, including

a dispute arising out of a decision of the Pueblo Lands Board which purported to extinguish Pueblo title to 27,000 acres within the Santo Domingo Pueblo Grant. SDPCSA, § 2. Section 6 of the SDPCSA, "Affirmation of accurate boundaries of Santo Domingo Pueblo Grant," provides:

(a) In general

The boundaries of the Santo Domingo Pueblo Grant, as determined by the 1907 Hall–Joy Survey, confirmed in the Report of the Pueblo Lands Board, dated December 28, 1927, are hereby declared to be the current boundaries of the Grant and *any lands currently owned by or on behalf of the Pueblo within such boundaries, or any lands hereinafter acquired by the Pueblo within the Grant in fee absolute, shall be considered to be Indian country within the meaning of section 1151 of title 18.*

(b) Limitation

*Any lands or interests in lands within the Santo Domingo Pueblo Grant, that are not owned or acquired by the Pueblo, shall not be treated as Indian country within the meaning of section 1151 of title 18.*

SDPCSA, § 6 (emphasis added). Read together, Subsections 6(a) and (b) clearly link status as Indian country to Pueblo title.

■ {22} A statement by Congress that a subsequent act is intended merely to "clarify" earlier legislation supports the inference that Congress understood the later legislation as continuing earlier law. *Bell v. New Jersey,* 461 U.S. 773, 789, 103 S.Ct. 2187, 76 L.Ed.2d 312 (1983). Subsection 2(b)(3) of the SDPCSA recites that one of the purposes of the act was "to clarify governmental jurisdiction over the lands within the Pueblo's land claim area." 25 U.S.C. § 1777(b)(3).

■ {23} The inference that a subsequent statute merely restates pre-existing law is strengthened when the legislative history of the statute contains a statement disclaiming any intention to significantly alter pre-existing law. *Bell,* 461 U.S. at 789, 103 S.Ct. 2187. The legislative history of the SDPCSA includes the statement that the SDPCSA "make[s] *no changes* in existing law." S. Rep. 106–506 at 13 (2000) (emphasis added).

{24} If § 6 of the SDPCSA merely clarifies pre-existing law without changing that law, then Subsection 1151(b) itself must have been understood by Congress as adopting a rule linking status as Indian country to non-extinguishment of Pueblo title. Congress' subsequent interpretation of Subsection 1151(b) in the context of the SDPCSA, while not definitive, nevertheless has "persuasive value." *Bell,* 461 U.S. at 784, 103 S.Ct. 2187. We consider it unlikely that Congress would have created a special rule solely applicable to one Pueblo, further complicating jurisdictional analysis. We consider it far more likely that, as the legislative history of the SDPCSA states, Congress merely was clarifying a rule that it understood already applied to Pueblo lands by operation of Subsection 1151(b).

■ {25} Defendant's case for exclusive federal jurisdiction is based on the misconception that § 1151 has completely abrogated the traditional rule linking status as Indian country to Indian title. While we agree that Subsection (a) has displaced *Bates–Clairmont* with respect to crime scenes "within the limits of any Indian reservation," a New Mexico Pueblo land grant is not a "reservation" within the meaning of Subsection (a). Because it is undisputed that the crime scene in the present case is located on land to which Pueblo title has been extinguished, the crime scene is not Indian country for purposes of § 1153 and the State retains jurisdiction to prosecute Defendant.

■ {26} Our analysis is consistent with the United State's Supreme Court's decision in *Venetie.* To constitute a dependent Indian community, the land in question must satisfy two requirements: "first, [the land] must have been set aside by the Federal Government for the use of the Indians as Indian land; second, [it] must be under federal superintendence." 522 U.S. at 527, 118 S.Ct. 948. As we have noted above, a PLA decree in favor of a non-Indian and against a Pueblo extinguished *both* the Pueblo's and the United States' title. Where neither the United States (as guardian) nor the Pueblo (as ward) retain an interest in the land in question, there is nothing that can be said to be set aside for the use of Indians. *See Seymour v.*

*Superintendent of Wash. State Penitentiary,* 368 U.S. 351, 357–58, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962) (suggesting that but for enactment of Subsection 1151(a) land within reservation owned in fee by non-Indian would not be Indian country because it "cannot be said to be reserved for Indians"); *United States v. Conway,* 175 U.S. 60, 68, 20 S.Ct. 13, 44 L.Ed. 72 (1899) (observing that grant by United States of property it does not own is "a simple nullity"). Land to which title has been quieted in favor of a non-Indian under the PLA cannot satisfy the set-aside prong of *Venetie.* 522 U.S. at 527, 118 S.Ct. 948.

■ {27} We are aware of the canon of construction that "statutes are to be construed liberally in favor of the Indians with ambiguous provisions interpreted to their benefit." *Chickasaw Nation v. United States,* 534 U.S. 84, 88, 122 S.Ct. 528, 151 L.Ed.2d 474 (2001) (internal quotation marks and citations omitted). We will assume that it is to the Pueblos' benefit to have Subsection (b) construed so that the status as Indian country of Pueblo lands is not tied to Pueblo title. However, canons of construction are "guides that 'need not be conclusive.'" *Id.* at 94, 122 S.Ct. 528 (quoting *Circuit City Stores, Inc. v. Adams,* 532 U.S. 105, 115, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001)). "[O]ther circumstances evidencing congressional intent can overcome their force." *Id.* at 94, 122 S.Ct. 528. We believe that such "other circumstances" are present here.

{28} We recognize that previously we have blurred the distinction between the definitions contained in Subsections (a) and (b). *See Ortiz,* 105 N.M. at 311–12, 731 P.2d at 1355–56. We did so prior to the Supreme Court's pronouncements in *Venetie* and without the benefit of Congress' subsequent legislative construction of Subsection 1151(b) in the SDPCSA. As the present case makes clear, there are potentially dispositive differences between the scope of Subsections (a) and (b). We therefore disavow *Ortiz* to the extent it suggests otherwise.

### *Solem* is Inapplicable

{29} Defendant, citing *Solem v. Bartlett,* argues that the State was required to prove

that the exterior boundaries of the Taos Pueblo land grant have been diminished so that the town of Taos is no longer within the land grant's exterior boundaries; and, that, absent such a showing, all land within the original boundaries of the land grant remains Indian country regardless of whether or not Indian title has been extinguished. We disagree.

{30} Diminishment analysis arises out of a completely different historical context: allotment and surplus lands acts.

> Many Indian reservations contain significant amounts of nonmember lands, due to the late-nineteenth-century policy of allotting reservation lands to individual tribal members. Allotments were subject to an initial 25–year restriction on alienation, after which an allottee could receive a patent-in-fee to the land. Although the general restriction on alienation was later extended indefinitely, many allottees nonetheless received patents-in-fee to their allotments, which terminated the trust responsibilities of the United States and allowed alienation of the allotted parcels. Many of the patented allotments were eventually sold to nonmembers. Such allotments generally remain part of the reservation.
>
> Once a reservation was fully allotted, Congress usually enacted legislation opening the remaining or "surplus" reservation lands to nonmember settlement. The method used to open reservation lands to settlement varied widely.... Whatever the method, the purpose of the surplus land acts was to return the lands to the public domain and thereby allow nonmember settlement under homesteading and other land disposal laws. While all the acts accomplished this, not all removed the lands from the reservation.

*American Indian Law Deskbook* 54 (Joseph P. Mazurek, et al., eds.1998). Diminishment analysis is concerned with determining whether Congress intended a surplus land act to remove reservation lands opened to non-Indian settlement from the reservation:

> Whether Congress, in opening surplus lands to nonmember settlement, freed

those lands from their reservation status is a question of congressional intent. Intent to remove reservation status is rarely found on the face of the involved statute since Congress, during the era of the surplus land acts, anticipated that the reservation system would shortly cease to exist. The process of allotting lands to tribal members and selling surplus lands to non-members was viewed as the "first step" toward Congress's ultimate aim of abolishing all Indian reservations, and Congress "failed to be meticulous in clarifying whether a particular piece of legislation formally sliced a certain parcel of land off one reservation." Since subsequent steps to abolish all reservations were never taken, the question becomes whether the surplus land acts, as the initial step in the process, were sufficient to complete the process in a single step instead of the expected series of steps. Courts have been unwilling to extrapolate from the overriding goal of abolishment a general congressional purpose of diminishing reservations with the passage of every surplus land act. Instead, courts examine each individual act to determine whether Congress intended the language of the specific act to diminish the reservation in question. Congressional intent is determined by examining the face of the act, its legislative history, events surrounding the act's passage, and subsequent treatment of the opened lands.

*Id.* at 56, 104 S.Ct. 1161. As Amicus Taos Pueblo concedes, "Congress never enacted a surplus lands act or otherwise opened Pueblo grant lands for non-Indian settlement."

{31} There is an additional historical ground for treating reservations and Pueblo land grants differently. In *Solem* the Supreme Court observed that

only Congress can divest a reservation of its land and diminish its boundaries. Once a block of land is set aside for an Indian reservation and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress explicitly indicates otherwise.

465 U.S. at 470, 104 S.Ct. 1161. *Solem* relied upon *United States v. Celestine,* 215 U.S. 278, 30 S.Ct. 93, 54 L.Ed. 195 (1909), as support for the above proposition. *Solem,* 465 U.S. at 470, 104 S.Ct. 1161. In *Celestine,* the United States Supreme Court observed that

[I]t was decided, in *Bates v. Clark,* 95 U.S. 204, 209, 24 L.Ed. 471, that all the country described ... as "Indian country" remains such "so long as the Indians retain their original title to the soil, and ceases to be Indian country whenever they lose that title, in the absence of any different provision by treaty or by act of Congress.". . . But the word "reservation" has a different meaning, for while the body of land described in the section quoted as "Indian country" was a reservation, yet a reservation is not necessarily "Indian country." *The word is used in the land law to describe any body of land, large or small, which Congress has reserved from sale for any purpose. It may be a military reservation, or an Indian reservation, or, indeed, one for any purpose for which Congress has authority to provide, and, when Congress has once established a reservation, all tracts included within it remain a part of the reservation until separated therefrom by Congress.*

215 U.S. at 285, 30 S.Ct. 93 (emphasis added).

{32} The history of New Mexico Pueblos shows that Pueblo land grants are not "reservations" within the meaning of federal land law. Congress did not reserve the Pueblo lands out of lands ceded by the Pueblo Indians to the United States or out of public lands owned by the United States. *United States v. Pueblo of San Ildefonso,* 206 Ct.Cl. 649, 513 F.2d 1383, 1388 (1975). Rather, Congress merely confirmed the pre-existing claims of the Pueblos, authorizing the issuance of patents "as in ordinary cases to private individuals." Ch. 5, 11 Stat. 374 (1858). Pueblo land grants are no more federal reservations than are other private grants confirmed by the United States as required by international law and the treaty of Guadalupe Hildago. *See* 19 Pub. Lands Dec. 326, 327 (1894) [1894 WL 929 (D.O.I.)]

(observing that patent to Cochiti Pueblo is "of the form adopted by the government with reference to all Spanish and Mexican land grants"); *Pueblo of San Ildefonso*, 513 F.2d at 1388.

{33} Defendant's reliance on *Solem* is misplaced. A test designed to determine Congress's intent in enacting a surplus lands act has no historical connection to Pueblo land grants.

## CONCLUSION

{34} We reverse the trial court and vacate the order of dismissal. This matter is remanded for further prosecution of the charge against Defendant.

{35} **IT IS SO ORDERED.**

I CONCUR: LYNN PICKARD, Judge.

JONATHAN B. SUTIN, Judge (dissenting).

SUTIN, Judge (dissenting).

{36} I respectfully dissent. I do not accept the major rationales underlying the majority opinion's result. I think the case should be remanded for further proceedings.

{37} I do not accept as a justifiable basis for the result cases decided from *Clairmont* back and cases relying on *Clairmont* or *Bates*. *See Clairmont v. United States*, 225 U.S. 551, 32 S.Ct. 787, 56 L.Ed. 1201 (1912); *Bates v. Clark*, 95 U.S. 204, 24 L.Ed. 471 (1877). Those cases were decided in contexts and times too far removed to be of assistance in deciding the present case. I am not persuaded by the rationales of reliance by cases on a repealed definition under the 1834 act or of adoption by courts or Congress of a rule stemming for these early cases linking status as Indian country to non-extinguishment of Indian title.

{38} I prefer to begin with the 1910 Enabling Act (the Enabling Act) for New Mexico statehood and *Sandoval*. *See United States v. Sandoval*, 231 U.S. 28, 34 S.Ct. 1, 58 L.Ed. 107 (1913); New Mexico Enabling Act, ch. 310, 36 Stat. 557 (1910). The Pueblo Lands Act of 1924 (the PLA), of course is important. *See* Pueblo Lands Act, ch. 331, 43 Stat. 636 (1924). Then, "[i]n the 1930's the federal Indian policy had shifted back toward the preservation of Indian communities generally" leading to the Indian Reorganization Act of 1934, ch. 576, 48 Stat. 984. *United States v. John*, 437 U.S. 634, 645, 98 S.Ct. 2541, 57 L.Ed.2d 489 (1978). Of course, *Venetie* must be addressed. *Alaska v. Native Vill. of Venetie Tribal Gov't*, 522 U.S. 520, 118 S.Ct. 948, 140 L.Ed.2d 30 (1998).

{39} The 1910 Enabling Act, the applicability of which has not been argued on appeal, recognized federal dominance and governance over lands then held or occupied by Pueblo Indians. Those lands were considered Indian country. Then came the PLA in 1924. The purpose of the PLA was to remedy the complex and confused land title issues that existed due to the history of non-Indian settlement and ineffectual federal protection of the grant lands. It was not enacted for the purpose of affecting the jurisdictional status of the parcels, the Pueblo communal title to which was extinguished under the PLA. Nothing in the PLA suggests extinguishment of law enforcement jurisdiction, complete alienation of any geographically defined and contiguous portion of Pueblo land grants, or modification of land grant boundaries. Pursuant to the PLA, Taos Pueblo's communal title to the land in question and to other parcels of land was extinguished. As to those parcels, title was quieted in non-Indians; as to the remainder, title was confirmed and preserved in the Pueblo.

{40} *Venetie* sets out what it takes to establish a dependent Indian community. The definition is based on the Court's readings of *Sandoval*, *United States v. Pelican*, 232 U.S. 442, 34 S.Ct. 396, 58 L.Ed. 676 (1914), and *United States v. McGowan*, 302 U.S. 535, 58 S.Ct. 286, 82 L.Ed. 410 (1938). Although no case appears to analyze the issue, and although I am not entirely sure how a land grant set aside for the Pueblo occupancy that is subject to federal superintendence encompasses a dependent Indian community but one parcel within the grant's exterior boundaries under non-Indian ownership due to the PLA is not a dependent Indian community, it does appear that federal cases have applied the dependent Indian community definition to individual parcels.

{41} Nonetheless, *Venetie* did not involve Pueblo land grants or the PLA. It did not involve individual parcels situated within a land grant or even within a reservation. It involved revocation of an entire reservation. In addition, the express purpose of that revocation was "to end the sort of federal supervision over Indian affairs that had previously marked federal Indian policy," and also to settle land claims "without creating a reservation system or lengthy wardship or trusteeship." 522 U.S. at 523–24, 118 S.Ct. 948 (internal quotation marks, emphasis, and citation omitted). *Venetie* is very different.

{42} It appears to me that interpretation of 18 U.S.C. § 1151(a) and (b), and future refinement of *Venetie*, in regard to jurisdiction to enforce criminal law, are works in progress, at least insofar as federal courts are concerned. On the federal level, *HRI, Inc. v. Environmental Protection Agency*, 198 F.3d 1224 (10th Cir.2000), indicates, and I suggest *State v. Ortiz*, 105 N.M. 308, 731 P.2d 1352 (Ct.App.1986), on the state level, shows, that there is room for interpretation of congressional intent favoring a blending of the "reservation" and "dependent Indian community" concepts and the statutory subsections, at least insofar as major crimes are concerned, notwithstanding the rejection by *State v. Frank*, 2002–NMSC–026, 132 N.M. 544, 52 P.3d 404, of the Tenth Circuit's community of interest doctrine. *See also Blatchford v. Gonzales*, 100 N.M. 333, 335, 670 P.2d 944, 946 (1983) ("[I]t is apparent that Indian reservations and dependent Indian communities are not two distinct definitions of place, but definitions which largely overlap."). We have determined that "the *Sandoval* Court identified the pueblo in question as a distinctive Indian community in order to conclude that Congress had jurisdiction to legislate with respect to the lands then held or occupied by Pueblo members." *Ortiz*, 105 N.M. at 311, 731 P.2d at 1355. As far as I can tell, by its identification of dependent Indian community for the particular purposes stated, *Sandoval* did not intend the terminology to run a course through statute and case law that would ultimately separate reservations from dependent Indian communities for federal government dominance and superintendence and enforcement of major crimes by Indians against Indians. I am not prepared to hang my hat on *Venetie* to arrive at an extinguishment of federal jurisdiction to prosecute major crimes.

{43} I do not place much stock in the Santo Domingo Pueblo Claims Settlement Act of 2000, 25 U.S.C. §§ 1777 to 1777e (2000) (SDPCSA), which ratified and provided for the enforcement of an agreement between the United States and Santo Domingo Pueblo. S.Rep. No. 106–506 at 1 (2000). The agreement and the statute embody specific land claims settlements and whisk away the land title clouds that existed and were being litigated in aged lawsuits. The agreement "was negotiated in consultation with the State of New Mexico, other pueblos, local governments and private landowners, to settle the Pueblo's land claims and provide for settlement of decades-old lawsuits involving title to more than 80,000 acres of public, private, and Indian land." *Id.* One lawsuit, involving tens of thousands of acres of land that was subject to overlapping Spanish land grants, resulted from a decision of the Pueblo Lands Board under the PLA. *Id.* at 2–3, 10–11.

{44} I do not read *Clairmont* and *Bates*, nor do I find any rule of linkage stemming from those cases or developed independently later on, as driving the placement of the jurisdictional provision in, or as codified by, the SDPCSA. No such existing case or case law is set out in Senate Report 106–506 or in the SDPCSA. One can infer from § 1777d(b) that in the give-and-take of settlement, the Santo Domingo Pueblo gave up a claimed right to jurisdiction as to the overlap area, and that the United States, unconcerned, agreed in order to get forty years of litigation concluded once and for all. Senate Report 106–506 reports that the jurisdiction matter was inserted "[i]n order to avoid jurisdictional confusion." S.Rep. No. 106–506 at 12–13. I think it is a mistake to generally apply § 1777d(b) as a statement of Congress's intent that all land within New Mexico Pueblos' exterior boundaries that is held in non-Indian title due to PLA extinguishment is no longer Indian country within the meaning of § 1151.

{45} Finally, apropos to our view of legal history from the time of the PLA, Justice Brennan's dissent in *Mountain States Telephone & Telegraph Co. v. Pueblo of Santa Ana*, 472 U.S. 237, 105 S.Ct. 2587, 86 L.Ed.2d 168 (1985), is noteworthy:

[T]he District Court for the District of New Mexico and the Court of Appeals for the Tenth Circuit ... over the last 60 years have consistently held that Pueblo lands are *fully* governed by the Nonintercourse Act [see discussion of this Act, *Mountain States*, 472 U.S. at 241–45, 105 S.Ct. 2587] and that such lands are inalienable without explicit congressional authorization.... The decisions below were merely the most recent applications of this settled law. And this settled law not only did not conflict with decisions of this Court, but followed directly from them.

*Id.* at 280–81, 105 S.Ct. 2587 (footnotes omitted) (Brennan, J., dissenting).

{46} Nothing express exists to date from Congress from which a court can find a congressional intent to extinguish federal major crimes jurisdiction (which, at the same time, would necessarily entail extinguishment of Pueblo criminal jurisdiction), or to encroach on Pueblo sovereignty. Therefore, it seems to me the burden ought to be on the State to prove extinguishment of federal jurisdiction to prosecute major crimes committed on the land in question by substantial and compelling evidence of a congressional intent to remove the land from Indian country, having considered the consequences that flow from that removal.

{47} The *Venetie* test appears to identify land (as opposed to land and community) as dependent Indian community only if it passes the two-part test. 522 U.S. at 526, 118 S.Ct. 948. However, when the State asserts jurisdiction over a non-Indian owned parcel within the exterior boundaries of a Pueblo land grant, I think it appropriate to require the State to prove the negatives of both "set aside for occupancy" and "federal superintendence." This proof burden employs a presumption favoring Pueblo sovereignty. It rejects a presumption that extinguishment under the PLA of Pueblo communal title automatically amounted to an extinguishment of federal superintendence and of the parcel's status as Indian country for major crimes jurisdiction. *Cf. Mattz v. Arnett*, 412 U.S. 481, 505, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973) ("A congressional determination to terminate [a reservation] must be expressed on the face of the Act or be clear from the surrounding circumstances and legislative history."); *Seymour v. Superintendent of Wash. State Penitentiary*, 368 U.S. 351, 358, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962) ("[T]he State can point to no language in § 1151's definition of Indian country which lends the slightest support to the idea that by creating a townsite within an Indian reservation the Federal Government lessens the scope of its responsibility for the Indians living on that reservation."). It at least might blow some life into the notions of "people," "culture," and "community," and their continuity and survival, notions not unreasonably to be considered along with the land as a focus of superintendence. The underlying issues, after all, involve people and culture, and not just land ownership. The Pueblo's concern about loss of sovereignty through slippery-slope court decisions that eliminate the Pueblo's authority over its members, and the State's concern that crimes by Pueblo Indians will not be adequately dealt with outside the State criminal justice system.

{48} The issues here involve practical, legal, and sovereignty considerations. As a practical matter, I do not as yet see a compelling reason why major crimes committed by Taos Pueblo Indians against Taos Pueblo Indians on the land in question cannot be prosecuted by the United States. (I can see a practical reason why the United States attorney may prefer not to have to deal with these crimes if the State will step in.) As a sovereignty matter, it is easy to understand the Pueblo's deep cultural and historical concerns about the loss of federal and Pueblo jurisdiction, particularly when the land in question was a part of the original land grant, remains situated within the exterior boundaries of the land grant, and is land the federal government removed from Pueblo communal title under the PLA. As a legal matter, as I discuss earlier in this opinion, I am not prepared to read into the PLA an

intent that was not expressed and probably not present, to apply *Venetie* by rote, to use the SDPCSA as a statement of congressional intent, or to reject the notion that the United States Supreme Court might refine *Venetie* or distinguish it in the context of Pueblo land grants and PLA parcels.

{49} My instincts tell me that this case should be remanded to the district court for further proceedings. Amicus were not involved in the district court proceedings. Section 1151(b) was not argued below. Defendant argued that § 1151(a) applied; the State argued that § 1151(c) applied. *Venetie* was hardly mentioned below and was never argued as instructive or controlling authority. Nor was *Venetie* mentioned in the district court's decision letter.

{50} In addition, the district court proceedings are noteworthy. Defendant was indicted on June 19, 2001. The New Mexico public defender entered an appearance for Defendant on July 3, 2001. On August 13, 2001, Defendant moved to dismiss for lack of subject matter jurisdiction. Defendant requested an evidentiary hearing on the motion on August 13 and again on October 23, 2001. The hearing was held on November 5 and November 28, 2001. On November 21, 2001, Defendant asked for a continuance of a November 27, 2001, trial setting to develop facts related to new issues the State was raising, namely the extinguishment of Taos Pueblo rights in 1924 and that the land in question was no longer Indian country. Defendant needed time to "perfect the issue of subject matter jurisdiction," because the State raised "a new evidentiary issue," requiring time "to perfect the factual basis for his appeal on the issue of subject matter jurisdiction." Nevertheless, the hearing occurred on November 28, 2001. Defendant offered to plead guilty, conditioned on his right to appeal on the issue of subject matter jurisdiction. The court then heard the jurisdiction issue. *Venetie* was very briefly mentioned by defense counsel. In the hearing, the court acknowledged that "it's been a long while since I really dealt with what are termed 'Indian law issues.' ... It's been too many years." Nothing was mentioned in the hearing regarding Defendant's motion for continuance,

presumably because Defendant offered to enter a conditional plea. The court suggested that Defendant enter his plea, and, although the court took the jurisdiction issue under advisement, the very next day, on November 29, 2001, the court issued its letter decision, stating that the indictment must be dismissed for lack of jurisdiction.

{51} The foregoing procedural recitation indicates that it was likely that neither Defendant nor the district court thought it necessary to continue the case to allow further factual development by Defendant. Considering the district court's very quick decision, the court may not have been concerned about any lack of factual development before accepting Defendant's plea. The court probably felt on November 28 that it was going to hold in Defendant's favor based on the § 1151(a) and (c) arguments, on cases involving reservation diminishment and surplus lands, and on *Ortiz*. The problem with what occurred is that an appellate court might not affirm the district court's dismissal, and Defendant could lose without having had the opportunity to make a critical factual record. That is what has now occurred. Whether this was Defendant's mistake, or the court's, is of little consequence here. This case is too significant for such a technical inquiry.

{52} Further, on appeal, *Venetie* was not mentioned in the State's brief in chief and its mention in Defendant's answer brief is of no consequence. The State's brief in chief and Defendant's answer brief are of little assistance. Obviously, the evidence presented in the district court was not honed to the real issue, namely, dependent Indian community under § 1151(b). Amicus stray some from the issues as they were tried below, but they do not hit the real issues on the head. The State does a complete about-face in its reply briefs, not only raising a critical theory and arguments not raised in its brief in chief, but also arguing as its primary and major theory a point that is inconsistent with the major point it raised in its brief in chief. We normally do not consider arguments raised for the first time in a reply brief. *State v. Castillo–Sanchez*, 1999–NMCA–085, ¶ 20, 127 N.M. 540, 984 P.2d 787. Neither Defendant nor any Amicus attempted an additional brief

on the State's new point. There are solid indications that the factual record is not as complete as it ought to be. In its reply brief to Defendant's answer brief, the State sees the defects and proposes the alternative remedy of remand.

{53} I am not interested in deciding a case as important as this on appeal when it was tried solely on inapplicable statutes and issues and for the most part on questionable case law, and when it seems obvious that further evidence material to the applicable statutes, the critical issues, and the applicable case law, would assist the district court in arriving at findings of fact, conclusions of law, and a judgment on the right issue, and would also assist the appellate courts that review the proceedings in the district court. *See United States v. Martine*, 442 F.2d 1022, 1023 (10th Cir.1971) (discussing significance of evidence as to, among other things, "the relationship of the inhabitants of the area to Indian Tribes and to the federal government, and the established practice of government agencies toward the area" when determining whether an area is a dependent Indian community). As a general rule, we do not review matters not presented below. *Campos Enters. v. Edwin K. Williams & Co.*, 1998–NMCA–131, ¶ 12, 125 N.M. 691, 964 P.2d 855; *cf. Berlangieri v. Running Elk Corp.*, 2002–NMCA–060, ¶ 37, 132 N.M. 332, 48 P.3d 70 (Sutin, J., dissenting) (expressing disfavor with the majority's decision on an issue neither tried below nor placed before this Court by the parties), *aff'd* 2003–NMSC–024, 134 N.M. 341, 76 P.3d 1098 (affirming, but not on the issue as decided by the majority).

{54} This matter of first impression in our Court is an important one, in need of resolution. As I understand it, the United States District Court for the District of New Mexico has issued an unpublished order that upholds State criminal jurisdiction on land that is in the City of Espanola and not Indian country although it is within the exterior boundaries of the Santa Clara Pueblo. Perhaps ominous in regard to Pueblo interests, the United States has not intervened in, or requested to supply an amicus brief, in the present case. Although it may be that Defendant will ultimately lose and the Pueblo's interests will be

adversely affected unless they can develop facts that will persuade the district court to stay with dismissal and persuade the majority in this Court to affirm, this Court, our Supreme Court, and the United States Supreme Court (if the case were to arrive at its doorstep) nevertheless deserve a more fully developed evidentiary record and more fully developed legal positions and arguments, on the practical, legal, and sovereignty issues. The public defender appellate division of the State of New Mexico should not stand alone in the trial on jurisdiction. Interested parties such as the two Pueblos that filed Amicus briefs should take active roles in the trial of the issues on the merits. The United States should be invited to participate and should participate. The issues go far beyond the individual Defendant in this case. I realize that the case can be decided on the present record, but I do not think it judicious or prudent to do so.

{55} One lingering and troublesome question that seems to avoid the fray is why, as to federal major crimes jurisdiction, non-Indian owned parcels in reservations should, as a practical, legal, or sovereignty matter, be treated differently than non-Indian owned parcels in land grants. I understand there are historical distinctions between reservations and land grants in regard to Tribal rights to transfer title to property. To the extent distinctions existed, what is the rational basis for bringing them forward into § 1151 as a basis to distinguish between reservations and dependent Indian communities? Does § 1151(b) signal anything but an attempt by Congress to acknowledge the United States Supreme Court's judicial recognition of dependent Indian communities together with Congress's own recognition of federal dominance and governance of those communities. I suggest that, if courts must judicially resolve this jurisdictional dispute, it may be time for the courts to refrain from attempting through misfigured pieces to put together a perfect puzzle. The legal backdrop is quaggy and unstable. What exists is a hodgepodge of cases involving a patchwork of statutes, and a mishmash of analyses, stated purposes, arguments, and results, providing, in my view, no common direction for the right result in this case. I am unable to find

a congressional purpose that leads me to a definitive, much less right, result. The solution in this case needs a political, not a judicial solution.

{56} It is "Congress, in pursuance of the long-established policy of the government, [that] has a right to determine for itself when the guardianship which has been maintained over the Indian shall cease. It is for that body, and not the courts, to determine when the true interests of the Indian require his release from such condition of tutelage." *Sandoval,* 231 U.S. at 46, 34 S.Ct. 1 (internal quotation marks and citation omitted). This early proclamation merits repeating today, not so much for the protective and paternalistic aspects needed at the time of New Mexico statehood, but as a guide for courts when considering issues that, in the last analysis, concern Pueblo sovereignty and require sensitive and important policy determinations.

{57} I recognize that the cry for political solution is of little consequence when the issues are dropped in a court's lap, particularly in view of Congress's continued abstinence. Thus, in the vacuum of congressional interest and action, if a policy determination must be made by an appellate court, let us do so on a better record, with fuller analyses and argument. To the extent a judicial solution is required because the matter is here, more than is presently before this Court is required to assure, as best we can, the right result. While the issues are in this Court, they should carry with them the fullest, most effective possible presentation of relevant evidence, of applicable case law, and of the practical and sovereignty consequences of any court decision.

{58} It is obvious that, in order to decide a case such as this, in their search for congressional intent courts will naturally hunt for relevant statutory language, legislative history, and generally-held contemporaneous understanding of its effect. In my view, this is, and will continue to be, a largely unsuccessful hunt in the present case. In such a circumstance, a court is compelled to turn to historical federal government, Pueblo, and State actions in regard to relevant lands, to practical consequences, and to what is right for the competing sovereigns, precisely what Congress ought to be addressing.

{59} Cases involving reservations, allotments, and surplus lands and involving concepts relating to those circumstances, including the diminishment of reservation boundaries, seem to me to be useful only for phrases taken from them and patched into Pueblo land grant issues in order to reach a particular result. I question whether there exists any analogical benefit from that practice with respect to the issues at hand.

{60} I recognize that distancing cases relating to reservations, allotments, and surplus lands from cases relating to Pueblo land grants and the PLA may not fully square with the notion that, for the purposes of jurisdiction, reservations, and land grants perhaps ought to be treated similarly. Nevertheless, it appears to me that it might be sensible to read congressional intent to be that of similar treatment for jurisdiction purposes until Congress expressly states what the majority holds, or at least until the State can present substantial and compelling evidence of such congressional intent.

{61} If I were to pick and choose among reservation-related cases, as I indicated earlier I would comfortably reject cases pre-dating *Sandoval,* and it would seem reasonable to choose to apply to the present circumstances a view similar to that stated in *Solem,* namely, that "[w]hen both an act and its legislative history fail to provide substantial and compelling evidence of a congressional intention to diminish Indian lands, we are bound by our traditional solicitude for the Indian tribes to rule that diminishment did not take place and that the old reservation boundaries survived the opening." *Solem v. Bartlett,* 465 U.S. 463, 472, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984).

{62} Further, I understand that canons of statutory construction generally consist of either a "thrust" and a "parry" or of a "thrust" and a "counterthrust." *See* Karl N. Llewellyn, *The Common Law Tradition,* App. C (Little, Brown & Co.1976) (1960). In the present case, I prefer to stick with the "thrust," namely, that "statutes are to be construed liberally in favor of the Indians with ambiguous provisions interpreted to

their benefit." *Chickasaw Nation v. United States,* 534 U.S. 84, 88, 122 S.Ct. 528, 151 L.Ed.2d 474 (2001) (internal quotation marks and citation omitted). In her dissent in *Chickasaw,* Justice O'Connor refers to this rule as "the Indian canon," and she states that it "presumes congressional intent to assist its wards to overcome the disadvantages our country has placed upon them." *Id.* at 99, 122 S.Ct. 528. It carries "the presumption that Congress generally intends to benefit the Nations." *Id.; see also United States v. Thompson,* 941 F.2d 1074, 1077 (10th Cir. 1991) (referring to cases that "stand for the proposition that when congressional intent with respect to an Indian statute is unclear, courts will presume that Congress intended to protect, rather than diminish, Indian rights").